# MARYLAND AND PENNSYLVANIA RAILROAD *vs.* LAWRENCE G. TUCKER.

*Appeals; prayers and instructions; interpretation; rejection of proper prayer, when not reversible error. Drunkenness; opinion of witness. Witnesses; answers to questions afterwards objected to. Prayers; evidence. Common carriers; duty of agents to passengers; termination of passenger relation; intoxicated passengers; abusive language and violence.*

Where the language in testimony that is objected to is susceptible of two interpretations, if the counsel on both sides have given it the same interpretation, the Court of Appeals will assume it to have been so understood by the Court below.  p. 50

Where drunkenness may be proved, a witness who saw the party in question may be asked whether he appeared to be under the influence of liquor.                          pp. 50-51

But a witness who answers: "I don't know whether I can judge or not," disqualifies himself from afterwards giving his opinion on the question.                          p. 50

Where a witness answers a question before it is objected to, and there is no motion to strike out the answer, the ruling of the trial court on the objection can present no reversible error. p. 52

A prayer predicated upon the theory that the plaintiff directly contributed to his injury by voluntary intoxication should not be granted if there is any evidence that the plaintiff was not intoxicated. p. 54

The intoxication of the plaintiff can not defeat recovery in an action for damages against a common carrier where there is any evidence of undue violence by the defendant's servants to the plaintiff while a passenger. p. 54

While it is difficult to quietly accept abusive and opprobrious language, it is the duty of the servants of common carriers to restrain their own temper and passion under such provocation, and to refrain from any more force or violence than is necessary in the performance of their duty. p. 55

In an action against a common carrier to recover damages for an assault and battery committed by one of its agents against the plaintiff, abusive language and violent resistance by the plaintiff to being ejected can only be considered in mitigation of damages and can not defeat recovery. p. 55

The relation of passenger and railroad company terminates after the arrival of the train at its destination and after the passenger has had reasonable time and opportunity to alight and leave the car. p. 57

The granting of a defective prayer is no ground for reversal if the exceptant's case was not impaired thereby. p. 57

It is the duty of common carriers to use due care in the selection of their agents, so as to protect passengers from injury by them, but they are not held to the highest degree of skill and diligence, as they are in the case of the duty imposed upon them in regard to the condition of the appliances, machinery, engines, etc. p. 58

*Decided February 3rd, 1911*

Appeal from the Circuit Court of Baltimore County (DUN-CAN, J.).

The following are the prayers which were offered in the case and referred to in the opinion of the Court:

*Plaintiff's 1st Prayer*—If the jury find that the plaintiff was received and accepted by the defendant company upon one of its trains of cars as a passenger to be carried from Bel Air, one of its stations on its road to Baltimore City, the terminus of its road, for a reward to the defendant, then it became and was the duty of the defendant to exercise for the plaintiff's safety during his trip to and arrival at said city, while such passenger, the highest degree of care, skill and diligence, consistent with the nature of its undertaking. (*Granted.*)

*Plaintiff's 2nd Prayer*—If the jury find the facts stated in the plaintiff's first prayer, then the defendant's said duty was not limited to merely furnishing the plaintiff transportation while such passenger, but also to accord him good treatment and freedom from personal rudeness and wanton interference with his person by its agents employed in the management of its train. (*Granted.*)

*Plaintiff's 3rd Prayer*—If the jury find the facts stated in the plaintiff's first prayer, then even if they should find that the plaintiff was intoxicated during said trip and when he arrived at the North avenue station, such intoxication did not relieve the defendant of the duty to exercise toward the plaintiff the highest degree of care, skill and diligence, consistent with the nature of its undertaking. (*Granted.*)

*Plaintiff's 4th Prayer*—If the jury find from all the evidence in the case that the servants or agents of the defendant in charge of said train struck and beat the plaintiff, as alleged in the plaintiff's declaration, then in estimating the damages they are to consider the physical and mental suffering to which he was subjected by reason of the said injuries and to allow the plaintiff such damages, as in the opinion of the jury

will be fair and just compensation for the injuries which he has thereby suffered. (*Granted.*)

*Plaintiff's 5th Prayer.*—If the jury find from all the evidence in the cause that the plaintiff was injured by the servants and agents of the defendant, in charge of the train as alleged in his declaration and that the plaintiff was treated with unnecessary, wanton and reckless violence, and indignity, then they may find such further damage as they may think proper to punish such conduct and deter the defendant from like conduct in the future. (*Granted.*)

*Plaintiff's 6th Prayer.*—Even if the jury should believe that while a passenger on the defendant's train the plaintiff acted in a disorderly manner, and that it became necessary for the defendant's servants on said train to remove him, still, if the jury find that in removing the plaintiff from the train, the said servants, in charge of the train, used unnecessary force upon his person then their verdict must be for the plaintiff, and in estimating the damages they may allow the plaintiff, such sum of money as in their judgment will compensate him for the wounds and injuries inflicted upon him by the use of such unnecessary force (if they find such wounds and injuries were inflicted). (*Granted.*)

*Defendant's 1st Prayer.*—If the jury find that the plaintiff was a passenger on a train of the defendant on the 16th day of June, 1908, from Bel Air to Baltimore, and was intoxicated and on the arrival of the train in Baltimore was asleep and when aroused did not get up and go out with the other pasengers, but remained for some minutes and until it was necessary to remove the car from the station platform to the yard and refused to leave the platform of the car when requested by the brakeman, and was abusive of the brakeman, then it was the duty of the brakeman to remove him from the platform and of the conductor to assist the brakeman in so doing, and if the jury further find that the conductor and brakeman did so remove the plaintiff and in doing so used only such force as was necessary for the pur-

pose, then the plaintiff is not entitled to recover in this action and their verdict must be in favor of the defendant. (*Granted.*)

*Defendant's 2nd Prayer.*—If the jury find the facts stated in the defendant's first prayer, except those in reference to the degree of force used in removing the plaintiff from the car platform and further find that the plaintiff when refused to leave the car platform was violent to and abusive of the brakeman, and that such conduct of the plaintiff induced greater vigor and force on the part of the brakeman and conductor in ejecting the plaintiff than would otherwise have been applied, but that there was used only so much as men of ordinary prudence would have used under the provocation of like circumstances, then the plaintiff is not entitled to recover in this action and their verdict must be in favor of the defendant. (*Refused.*)

*Defendant's 3rd Prayer.*—If the jury find that the plaintiff on the morning of June 16, 1908, was under the influence of liquor when he boarded the defendant's train in Bel Air and slept from near Fallston to North Avenue, and upon reaching North avenue did not wake up and leave the car with the other passengers, but remained in the car for several minutes thereafter, and when aroused went upon the platform, and would not leave at the request of the brakeman, but held the brake wheel and rail and swore that no one could put him off, that brakeman Wiggers attempted to put him off but failed and later he was put off by conductor Golden, that he was then under the influence of liquor, and that neither the conductor nor brakeman used more force than was necessary for the purpose of putting him off, then their verdict must be in favor of the defendant. (*Granted.*)

*Defendant's 4th Prayer.*—If the jury find that the plaintiff was a passenger on defendant's road, from Bel Air to Baltimore and that when the train on which he was riding reached its destination at the Baltimore terminus, and that all the passengers except the plaintiff left the car, and that the plaintiff had reasonable time to get off and that he failed

to do so, then he ceased to be a passenger and the obligation of the defendant towards the plaintiff is a passenger no longer existed.   (*Refused.*)

*Defendant's 5th Prayer.*—That under the pleadings there is no legally sufficient evidence in this case to entitle the plaintiff to recover, and their verdict must be in favor of the defendant.   (*Refused.*)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, THOMAS, PATTISON and URNER, JJ.

*D. G. McIntosh* (with whom was *Stevenson A. Williams*, on the brief), for the appellant.

*J. J. Archer* (with whom was *Elmer J. Cook*, on the brief), for the appellee.

PEARCE, J., delivered the opinion of the Court.

This is an appeal by the defendant below from a judgment against it, rendered in the Circuit Court for Baltimore County in an action brought to recover damages for an alleged assault and battery committed upon the plaintiff by the defendant's servants, in charge of defendant's train, upon which plaintiff had been carried as a passenger from Bel Air to Baltimore.

During the trial two exceptions were taken by the defendant, one to the exclusion of evidence offered and one to the ruling on the prayers.   The plaintiff, whose home was in Harford County, north of Bel Air, was a member of the 1st Maryland Regiment in June, 1908, and had been in camp at Fort Howard for about ten days just preceding the occurrence complained of, but returned from there, by way of Baltimore, to Bel Air, on the morning train, on June 16th, 1908.   There he was paid off by Captain McComas, and immediately purchased a round trip ticket from Bel Air to Baltimore for the purpose of going to the theatre that evening with a companion, James Guillot, and the two left

Bel Air on the 12.55 train.  He testified that he was fatigued
from his duties while in camp, and soon after leaving Bel
Air fell asleep and was asleep when the train reached Balti-
more; that he did not wake till roused by Guillot and being
somewhat dazed, sat still a minute or so, and then went to
the door of the car, where he stopped to brush his hair, when
some employee of the defendant brushed past him with some
remark which he did not understand; that he then went out
on the platform of the car to leave the car when some one
gave him a violent shove; that he caught hold of the brake
wheel and turned round to see who it was, when the brake-
man, Frederick Wiggers, struck him in the nose, saying "get
off, you son of a bitch;" that Wiggers then seized him by
the shoulders and Daniel Golden, the conductor, seized him
by the throat, and they threw him off the car and clear across
the station platform, and he fell almost under a car on the
opposite side of the platform; that he was badly bruised and
injured, suffered much pain and still suffers when he has
any heavy lifting to do.

Guillot's version of the affair makes it appear that there
was no provocation for the assault, and substantially agrees
with plaintiff's account.

Claude Brophy, a boy of fifteen years, also testified for
plaintiff, and his account agreed in the main with the plain-
tiff's.  These were the only witnesses for the plaintiff who
actually saw the difficulty.  The testimony of the brakeman
and conductor will be adverted to in considering the prayers.
There was evidence from defendant's witnesses—not denied
by plaintiff—that when he was paid off he had an alter-
cation with Captain McComas who forbad him to wear his
military dress coat on that trip, and that he used profane and
insubordinate language to his commanding officer; that he
was cursing and swearing in a boisterous and disorderly
manner at the station before taking the train, in the presence
of ladies, and was rebuked for this conduct by Constable
Sheridan, and that he replied that he, plaintiff, was a son
of a bitch.  There was also direct evidence tending to show

that he was intoxicated, and other evidence tending to show he was not intoxicated. On cross-examination he admitted that he drank a glass of beer in Baltimore that morning before starting to Bel Air and that he carried a half pint of whiskey to Bel Air which he said was for his friends and that he had only one drink out of that, but that he was not intoxicated that day, either in Baltimore or Bel Air. He did not deny cursing or swearing at the station, or being warned not to do so but said he could not remember either.

It thus became a material question in the case whether he was intoxicated at the time of the difficulty.

After the conductor, Golden, had described what occurred at that time he said: "I saw him again the next morning when he went with me to Bel Air on the train which left Baltimore at 9.30. He looked then as usual and made no complaint." The witness was then asked, "Were you able to form any judgment about his being under the influence of liquor *the day before,* from his manner the day the trouble occurred," to which he replied, "Well, I don't know whether I can judge or not, but I thought he was under the influence of liquor; he appeared to me to be under the influence of liquor." The record then proceeds "to which question and answer the plaintiff objected and the Court sustained the objection, whereupon the defendant excepted." Upon first reading, the inquiry here would seem to be about his condition *the day before* the occurrence, and not *at the time* of the occurrence, and if the Court below so understood it there could be no question as to the correctness of the ruling, since it would be impossible for any one to judge from the manner and conduct of another on a given day, whether he was intoxicated on the day before, but as counsel on both sides have treated the question as if it did not embrace the words, "the day before," we shall assume it was so understood by the Court below. We have been referred in the appellant's brief to a number of cases from Courts of high repute that a witness may be asked, where it is competent to prove drunkenness, whether one, "appeared to be under the influence of

liquor," and after a careful examination of those cases and consideration of the reasons upon which they rest we are of opinion that they correctly state the law in a case like the present.

In *State* v. *Pipe,* 49 N. H. 399, an "indictment for murder, the question was permitted, the Court saying "Intoxication is a fact open to the observation of any one, and requiring no special skill or learning to discern it."

In *Choice* v. *State,* 31 Georgia, 467, also an indictment for murder, the witness was allowed to say that "he judged from his appearance and manner the defendant had been drinking," and Judge Lumpkin said, "Such expressions, both in ordinary life, and in the Courts, convey to the mind with sufficient certainty the condition of a person, so as to enable one to pronounce a decision thereon with reasonable assurance of its truth."

In *Aurora* v. *Hillman,* 90 Ill, 61, the question allowed was, "was the party in your opinion under the influence of liquor?" The Court said, "a witness may state details of conduct, attitude, gestures, words tones, expression of eye and face, *or he may state the fact of intoxication,* a fact which he can ascertain by personal observation as he ascertains other facts."

In *People* v. *Eastwood,* 14 N. Y. 562, an indictment for murder, a witness was allowed to say whether from the prisoner's conduct and deportment he was in his judgment to any considerable extent under the influence of liquor. The Court said: "The inquiry was not intended to bring out an opinion, but to lead the witness to answer a fact which he saw * * * Whether a person is drunk or sober, or how far he was affected by intoxication is better determined by the direct answer of those who have seen him, than by discription of his conduct."

In *State* v. *Shinborn,* 46 N. H. 497, the question allowed was whether a horse appeared to be frightened, and the Court said: "It is impossible to state these minute characteristics of appearance and the like, which nevertheless may lead the

mind to a satisfactory conclusion, and be reasonably reliable in judicial investigations * * * In these cases the conclusion is drawn from evidence addressed to the eye, or ear, or both, and which from its very nature can not be described to another."

And in *Parker* v. *Steamboat Co.,* 109 Mass. 449, a witness was allowed to say that a plaintiff injured in an accident, "was worse and not able to do as much work as before," the Court saying: "This was one of many cases in which a witness may state the result of his observation, though it involves in a measure his opinion or judgment."

But we are of opinion that this witness by answering, "I don't know whether I can judge or not," disqualified himself from afterwards giving, *as his judgment,* that he appeared to be under the influence of liquor, and that there was therefore no error in holding that part of his answer inadmissible, but as in *Aurora* v. *Hillman,* when another witness had first said he could not swear the party was intoxicated, he could not then be asked if, from what he saw, he appeared to be intoxicated.

In any event there could be no reversible error in this exception, because the question was answered before any objection was made; there was no motion to strike out any part of the answer; the whole answer remained in the case, and the defendant had the full benefit of it before the jury. Moreover, the fact of intoxication was proved without objection by the elder Guillot, who said he could certainly tell a drunken man, and that "both plaintiff and Peterson were that way" when they were going to the station. Sheridan said: "I know he was drinking," and Myers said positively: "He was under the influence of liquor."

After such testimony no injury could be worked by Golden's answer, whatever view might be held of the propriety of the question objected to.

We now come to the prayers, which we shall request the Reporter to set out in full, but before considering them we

shall briefly summarize the more important testimony of the brakeman, conductor and yard conductor..

The brakeman, Wiggers, said: "When we got to Baltimore I helped all the passengers off except Tucker, two of whose friends were trying to wake him up. I went to the rear end of the car to take down my flags, and when I came in he was up and near the door, when a car cleaner came in and passed him. When I got to the platform of the car he was out, and Guillot was on the station floor persuading him to get down. I said, "Go on down," and he said, "Go to hell, I am not going down, and no one can put me down." I started to put him off, but he had hold of the brake wheel and I could not do it, as I have lost two ribs over my heart and am weak there. Then I started for the baggage car to change my uniform. Just then the conductor came out of the ladies' car and told Tucker to get off, and he refused and cursed us both. The conductor then went past Tucker and got on the steps below him, put his arms around him and pulled him down the steps to the station floor. I caught hold of his clothing to help break his hold on the wheel, and in the struggle my hand flew in his face, but I did not intend to strike him. The conductor did not say a word to Tucker after pulling him down the steps, and went away, and I went to the baggage car and changed my uniform. The train had been in at least five minutes when the difficulty occurred. Tucker was delaying the removal of the train to the yard, as the yard engine had backed up to remove it."

The conductor testified that on reaching Baltimore all the passengers except Tucker got off, and that he was about to go in that car to tell him to get off when he saw a couple of his friends have him by the arm bringing him out, and he thought he would get off with them; that he then went to the baggage car, took off his coat and cuffs and started to the office to report, having his coat and cuffs in his hand; that he heard loud talking on the platform of the smoking car and going there found Tucker holding on to the brake wheel, saying he would not get off, and no one could put him off;

that he laid his coat and cuffs on a seat in the ladies' car, forced himself behind Tucker on the platform and got down on the first or second step; reached his arms around his neck and brought him down to the station platform, and then let him drop; then he then put on his coat and cuffs and started away; saw Tucker start back up the car steps, and heard the yard conductor, Mr. Koontz, order him off. That when the train gets to Baltimore, the passengers and baggage are unloaded, which usually takes three to four minutes. The engine is cut loose, and the yard engine backs up to take the train to the yard, and that the yard conductor was there waiting to take the train to the yard until Tucker got off.

Koontz testified that before the difficutly began all the passengers had gone up the platform except two soldier boys standing at the car steps and asking Tucker to get off. He had hold of the brake wheel and refused to get off; said he would stay as long as he pleased and no one could put him off. The conductor then came and told him to get off, but he refused; that the conductor then put his arms around him and drew him to the station floor, Golden getting down first; that Tucker then started to go back on the car, but witness told him to get off, that he had to shift the train, and Tucker then desisted, and his two friends came to him; and that it was from four to six minutes after the train got in until Tucker was removed from the car. He said that he was looking at the parties while Golden was pulling him off the platform and saw Wiggers standing behind Tucker, but he did not strike him.

The defendant's 5th prayer was predicated upon the theory that the plaintiff directly contributed to his injury by his voluntary intoxication; but there was some evidence, though slight, that he was not intoxicated, and that alone would forbid the granting of that prayer. Nor would we be prepared to say, *in a case of this character,* that conceded intoxication would defeat recovery, there being any evidence of undue violence by defendant's servants while plaintiff was a passenger. This prayer was properly refused.

The defendant's second prayer is skillfully drawn and presents a question capable of argument, but we think it was properly refused. Difficult as it undoubtedly is quietly to accept abusive and opprobrious language, it is the duty of servants of carriers of passengers to restrain their own temper and passion, under such provocation, and to refrain from any more force or violence than is necessary in the performance of their duty to their master.

The use of greater force or violence than was reasonably necessary in removing plaintiff from the car would not be the use of only so much as servants of ordinary prudence in their situation were at liberty to use.

Abusive language, or violent resistance by the plaintiff to his removal from the car, could not excuse the use of excessive force or violence in effecting his removal, and could not defeat the plaintiff's recovery, though it might mitigate damages.

The defendant earnestly contends that its 4th prayer should have been granted, and this is the conclusion we have reached.

In *Wood on Railways,* page 1218, the rule is stated to be that the relation of passenger and carrier terminates after the arrival of the train at its destination, and after the passenger has had reasonable time and opportunity to leave the premises. This is the rational rule, and it has been frequently approved. The author, in stating the rule above, uses the word *"premises"* to indicate the continuance of the relation of passenger after leaving the train, where one is injured by reason of some defect in the station or its approaches under the control of the defendant, but in this case that question does not arise, and the word *"car"* may be substituted for *premises.*

In *Ginhoff* v. *Chicago and Milwaukee R. W. Co.,* 20 Wis. 362, the plaintiff was a passenger from Chicago to Milwaukee, the terminus of the railway, and was injured after the arrival there, and while still in the car, by being knocked down while the car was backing. There was a conflict of evi-

dence as to the length of time between the arrival and the backing of the train. The lower Court refused the following instruction asked by the defendant: "That if the train had stopped a reasonable time to enable all the passengers to get off, and plaintiff remained on the car, and afterwards received the injury in attempting to get off while the car was in motion, she could not recover." The judgment in favor of the plainitff was reversed for error in prayers granted the plaintiff, and the Court did not actually pass on the above prayer, but the Court said: "Whether the contract of common carrier was in force at the time of the accident was a severely contested point * * * ," and added: "It appears to us that when the train arrived at Milwaukee and the plaintiff knew it, and a reasonable time had elapsed for her to get off the cars, the relation of common carrier ceased; and a reasonable time is the time within which persons of ordinary care and prudence under like circumstances get off."

The case of *Kaase* v. *Gulf, Col. and Santa Fe R. R.*, 41 Texas Civil Appeals, is almost identical with the case before us. Plaintiff was a passenger from Lampasas to Gemple, the terminus of the railroad. He was asleep when the train reached Gemple, and there was evidence of his intoxication. The conductor announced the arrival of the train, and all the passengers except plaintiff left the train. The car cleaner entered the car about five minutes after the arrival of the train, when the conductor left for his home and the brakeman started for his home, but heard the car cleaner trying to get the man off and went back to help him, when the alleged assault occurred. There was a verdict for plaintiff, and on appeal the Court said: "The testimony submitted by defendant was such as justified the jury in finding the train had been there a reasonable and sufficient length of time for passengers to get off * * * . In other words we hold that the testimony offered by the defendant supports a finding that the plaintiff was not at the time he was assaulted a passenger."

The contention of the plaintiff is that in the case before us this 4th prayer is defective because it does not couple

*opportunity* with *time.* It may be conceded that such prayers are usually so framed, and there are cases in which it might be essential, to include opportunity as well as time; as where a train, either at a way or terminal station, stops long enough to enable any passenger to get off but does not stop at the usual or at a safe and proper place for that purpose. But under the facts of this case the word *opportunity* would add nothing to the meaning of the prayer. The undisputed evidence shows that both time and opportunity had been given for all to alight the plaintig after was awakened, at a safe place, and that all had alighted in safety from the *same car,* and at the *same place* where plaintiff, according to defendant's evidence, persistently refused to alight. In this state of proof, no possible injury could have been done the plaintiff by the omission of that word, and we are of opinion the prayer should have been granted as offered.

There was evidence on the part of the plaintiff sufficient to take the case to the jury on the question of unnecessary violence and indignity, and the plaintiff's 5th and 6th prayers we therefore think were properly granted, and we discover no error in granting the plaintiff's 4th prayer. We do not think the reference in it to the *allegation of the declaration as to the striking and beating of the plaintiff* was in conflict with the previous requirement, that the finding should be based "on all the evidence in the case," or that its phraseology could mislead the jury.

The general principles involved in the plaintiff's 1st and 2nd prayers, when granted in cases growing out of injuries received by passengers as the result of accidents in the actual operation of the train, are too well established to admit of question, and the highest degree of care, skill and diligence is the standard in all such cases; it is applicable in cases of defective roadbed, engines, cars, or any appliance used in the operation of trains; to defects in the stations or the approaches thereto, in the control of the defendant, and to collisions resulting from neglect of orders, or other negligence of those in charge of the operation of the train. This rule

was expressed in *Stokes* v. *Saltonstall,* 13 Peters, 181, followed in other cases, as binding the carrier "to transport his passengers safely as far as human care and foresight can go"; and the reason for this rule is that accidents arising from the causes above mentioned can be generally avoided by extraordinary foresight, whereas an injury received in an assault upon a passenger by a servant of the carrier is not dependent upon foresight, and cannot be anticipated by the carrier, unless he has negligently employed or retained a servant whose character he knew or might have known, by exercise of due care, rendered him in this respect unfit for his position, and in this case there is no evidence of such unfitness.

In this case therefore the defendant earnestly contends that the plaintiff's first, second and third prayers were improperly granted, and upon full consideration this contention seems to be founded in reason, and to be supported by satisfactory authority, at least as to the first and third prayers

In *Pa. R. R.* v. *Roy,* 102 U. S. 456, the Court said: "The carrier is responsible for injuries received by passengers in the course of transportation which might have been avoided or guarded against by the exercise upon his part of extraordinary vigilance, aided by the highest skill, and this caution and vigilance must necessarily be extended to all the agencies or means employed by the carrier in the transportation of passengers;" and proceeded to make special mention of the vehicles and appliances of transportation, without any intimation that the rule had been or should be extended to an unforeseen assault upon a passenger, and we have seen no case in which it has been so extended.

In *Stewart* v. *Brooklyn and Cross Town R. W.,* 90 N. Y. 591, cited in *Steamboat* v. *Brockett,* 121 U. S. 645, it was held that a carrier undertakes to protect his passengers while being conveyed, against the misconduct of his own servants while engaged in executing the contract, without characterizing the *degree* of care to which he is held; but in the latter

case, after citing the former, the Court expressly declared what was the degree of care, saying "this rule is founded upon public policy and convenience; every person is bound to use *due* care in the conduct of his business."

In *Hewes* v. *P. W. & B. R. R.,* 76 Md. 155, the Court, by intimation, strongly suggests the soundness of the defendant's distinction. The plaintiff alleged that she was carried beyond her destination because the train did not stop there long enough to enable her to leave the car with safety. The Court said: "The appellant's counsel in their argument placed much reliance upon a supposed analogy between the duty of the carrier to discharge passengers at their destination and his duty to provide for their safety while the journey was in progress. But the two conditions are by no means similar. From motives of humanity the law requires carriers of passengers to use the utmost care and diligence in guarding against *accidents* which may endanger the lives or limbs of the persons whom they undertake to transport," and then referred to *B. & O. R. R.* v. *Worthington,* 21 Md. 283, in which this Court adopted the language of CHIEF JUSTICE SHAW, in *McEllroy* v. *Nashua & Lowell R. R. Co.,* 4 Cushing, 402, requiring "the most exact care and diligence not only in the management of the trains and cars, but also in the structure and care of the tracks and in all the subsidiary arrangements necessary to the safety of the passengers."

In the *Hewes Case, supra,* this Court added: "But there is no such absolute and unconditional duty to discharge passengers at their destination. He must of course inform them that the end of ther journey has been reached, and he must afford them *proper and reasonable means and facilities* for departing in safety from the vehicle of transportation. The traveller is possessed of volition, and he may not choose to leave the vehicle; or, he may through negligence and inattention disregard the opportunity to leave which has been given him."

In *Miami R. R.* v. *Whetmore,* 19 Ohio St. 134, speaking of a granted prayer exactly correct but not adopted to the facts of the case, the Court said: "A charge, though not strictly objectionable in point of law but which leaves the jury to draw an incorrect inference from facts in the case material to the issue, will constitute ground for a new trial, where it is reasonable to suppose, from a consideration of the whole evidence that a different verdict would have been rendered if the jury had been fully instructed. The charge ought not only to be correct but to be so adapted to the case as not to be misconstrued or misunderstood by the jury in the application of the law to the facts as they may find them from the evidence."

The precise question for our consideration was presented and decided in *Ill. Cent. R. R. Co.* v. *Minor,* 69 Miss. 710. The plaintiff was injured on an excursion train by a pistol shot wantonly fired by a fellow passenger. The evidence showed that there was much disorder among the passengers, and that the conductor, when appealed to to suppress it, said "he did not care what they did so that he got his fares." The Court granted the plaintiff a long instruction the opening sentence of which was as follows: "Railroad companies are bound to exercise very great vigilence and care in maintaining order and guarding passengers against violence from any source, which might reasonably be anticipated or naturally expected to occur in view of all the circumstances and the number and character of the persons on board." The Court said: "The opening statement, the initial legal abstraction, is palpably incorrect, and was doubtless injuriously misleading. If this is correct the jury was told that the highest degree of vigilence and care was the test to be applied to the conduct of the company's servants in guarding Minor or other passengers, or to put it in anther way for the purpose of expressing its unsoundness, if the conductor and servants of the railroad company were in the slightest degree wanting in vigilence and care, then Minor was entitled to recover. Stated in any form the proposition is not true * * * and its

hurtfulness is not cured in other conflicting instructions given in which the jury were told that reasonable care and diligence was the measure of appellants' accountability."

In the case before us the 1st and 2nd prayers of the plaintiff, though different in verbiage from the instruction in the *Mississippi case,* had the precise effect of that instruction, and we are constrained to hold that they are not adapted to the facts of the case and were improperly granted. The vice of these prayers is emphasized by the inclusion in each, of the word *skill* which manifestly could have no appropriate place in the instruction even if they were not erroneous because laying down a false standard of care and diligence, as applicable to the facts of the case.

We do not think however that the plaintiff's 2nd prayer falls within the condemnation of the 1st and 3rd. It does not ennunciate the false standard of care. The reference to the 1st prayer is to the *facts only* there required to be found, viz, that plaintiff was a passenger on defendant's road from Bel Air to Baltimore for a reward to defendant, and the only legal proposition stated is that the contract of carriage included good treatment and immunity from wanton interference and personal rudeness, without however prescribing any decree of care to be observed in the execution of this feature of the contract.

The language is the same approved by JUDGE CLIFFORD, in *Pendleton* v. *Kinsey,* 3 Clifford, U. S. Cir. Ct. Reps. 427, and in other cases. We perceive no error in granting that prayer, nor in the overruling of the defendant's special exceptions to the plaintiff's 5th prayer.

But for error in granting plaintiff's 1st and 3rd prayers, and in refusing defendant's 4th prayer the judgment must be reversed.

> *Judgment reversed with costs to the appellant above and below and new trial awarded.*