IN RE: FORMAL INQUIRY CONCERNING
JUDGE DULANY FOSTER

[Misc. (Judicial Disabilities) No. 1,
September Term, 1973.]

*Decided April 29, 1974.*

450

The cause was argued on January 14, 1974, before BARNES, SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ., and CHARLES E. ORTH, JR., Chief Judge of the Court of Special Appeals, specially assigned, and reargued on March 26, 1974, before SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ., and CHARLES E. ORTH, JR., *Chief Judge*, and JAMES C. MORTON, JR., *Associate Judge, of the Court of Special Appeals*, specially assigned.

*Norman P. Ramsey* for Judge Foster.

*Laurence M. Katz* and *Richard C. Murray* for the Commission on Judicial Disabilities.

SINGLEY, J., delivered the opinion of the Court. SMITH and DIGGES, JJ., dissent and SMITH, J., filed a dissenting opinion in which DIGGES, J., concurs at page 478 *infra*.

This is the second occasion on which we are called upon to review a report and recommendation of the Commission on Judicial Disabilities (the Commission). The circumstances which led to the adoption of the two constitutional amendments, which first enacted and then amended Maryland Constitution art. IV, §§ 4A, 4B, creating the Commission, are set forth in the opinion of this Court in *In re Diener & Broccolino*, 268 Md. 659, 662-67, 304 A. 2d 587, 589-92 (1973), *cert. denied*, 94 S. Ct. 1586 (1974).

Judge Dulany Foster is Chief Judge of the Supreme Bench of Baltimore City, which is comprised of 21 judges who preside in six courts having either general law, equity or criminal jurisdiction, *see* Constitution, art. IV, § 27; Maryland Code (1974), Courts and Judicial Proceedings Article § 1-503 (b).

After widespread publicity in the news media relating to Judge Foster's activity in connection with the purchase and sale of a property known as the Carroll I. Young Farm, located in the City of Westminster (Westminster or the City), Carroll County, Maryland, the Commission was requested by Chief Judge Murphy of this Court — a request in which Judge Foster joined — to conduct a preliminary investigation of the matter, to ascertain whether Judge Foster's involvement in the transaction violated the Maryland Canons and Rules of Judicial Ethics.[1]

After a preliminary inquiry in which Judge Foster voluntarily participated, the Commission unanimously[2] voted to institute formal proceedings, charging violations of:

Maryland Canons of Judicial Ethics IV, VII, VIII, XXIII, and XXIV;
Maryland Rules of Judicial Ethics 6, 8, and 13; and

---

[1]. The Canons and Rules appear in Maryland Rule 1231.
[2]. William L. Marbury, Esq., the seventh member of the Commission, had disqualified himself.

original American Bar Association Canons of Judicial Ethics, Canons 4, 7, 8, 24, and 25.

The factual background of the matter, developed at the hearing before the Commission, is essentially this. In January, 1965, the Carroll Young Farm of about 190 acres was purchased by Jerome J. Gebhart and John A. Luetkemeyer, Sr. for $150,000.00, apparently on the advice of Lawrence Lockwood, a Baltimore real estate broker, who was confident that if the property were held for four or five years, it could be sold at a profit. In August, 1967, Westminster annexed some 1,000 acres of land, including the Young Farm. In September, 1968, Gebhart sold his one-half interest in the Young Farm for approximately $152,000.00 to the trustees of a trust (the McLanahan Trust), created by the will of the late Austin McLanahan, the father of Mrs. Luetkemeyer, Sr., and the grandfather of John A. Luetkemeyer, Jr. In November, 1969, Mr. Luetkemeyer, Sr. conveyed his one-half interest in the Young Farm to the McLanahan Trust for a stated consideration of $152,000.00, or about $1,600.00 per acre.

John A. Luetkemeyer, Jr. testified that at the time the McLanahan Trust acquired title to the entire Young Farm, it had assets of about $1,600,000.00; that the income beneficiaries were his two sisters and himself; that distribution of corpus was about to commence in several years, when his younger sister became 30, and that the Farm, while a suitable investment, was the only non-liquid asset of the trust.

Late in 1969, a decision was reached by the McLanahan Trust to sell the property. By this time, the Farm was within the City limits, water was available and a sewer was planned. The property was brought to Judge Foster's attention by Lockwood, one of the brokers who had participated in the original sale to Gebhart and Mr. Luetkemeyer, Sr. Judge and Mrs. Foster examined the property, reviewed the situation as regards zoning, and learned that the asking price was $2,500.00 per acre. In late December, 1969, the McLanahan Trust agreed to give Judge

Foster a one-year purchase option, for which Judge Foster personally paid $1,000.00. Although called an "agreement of sale," the option agreement, which was actually signed on 16 February 1970, was entered into between the McLanahan Trust and Wheeler Holding, Inc., a nominee of a Baltimore title company, as agent for Judge Foster.

There was testimony that in October, 1969, prior to Judge Foster's negotiations with the McLanahan Trust, a tract of 45 acres zoned agricultural owned by David Jones, and located across the road from the Young Farm, had been reclassified as R-10,000 from R-7500, except for four and one-half acres which were given commercial zoning.

It was in November or December that a significant conversation took place. Mr. Luetkemeyer, Jr. testified that his family had determined not to develop the property because of their lack of expertise and because of the notoriety which might be involved in an effort to obtain a change in zoning.[3]

When asked whether the issue of propriety had been raised with Judge Foster, Mr. Luetkemeyer, Jr. said:

> "Well, when I initially met Judge Foster, I asked him why he wished to purchase the land and were there any ethical problems I had to be concerned about. I believe Judge Foster felt that this was outside of his jurisdiction and there were no ethical considerations to worry about."

Before the option agreement was actually executed, Judge Foster had received a letter dated 21 January 1970 from Joseph H. Hahn, Jr., at the time the Mayor of Westminster. The gist of the letter was that the Planning and Zoning Commission for the City of Westminster (the Planning Commission) was expecting to receive from Judge Foster an application for the rezoning of the Young Farm in time for its regular meeting on 28 January. It would appear that this information may have come from Truman B. Cash, an

---

**3.** At this time, Mr. Luetkemeyer, Sr. was Treasurer of the State of Maryland; Mr. Luetkemeyer, Jr., Treasurer of Baltimore City.

associate of Lockwood's in Westminster, who had died prior to the hearing.

Judge Foster, who theretofore had not known Mayor Hahn, telephoned him, and asked to be introduced to the members of the Planning Commission by the Mayor. The Mayor did this, and left the meeting.[4] At this meeting, Judge Foster, who was not then or thereafter represented by counsel, requested the reclassification of the Farm in order to permit a density of more than six dwelling units per acre, and a change in zoning boundary lines. Coupled with the request was a proposal to give a 10 acre parcel to the City for the erection of a civic center, a commitment which would seem to have been made earlier by Mr. Luetkemeyer, Sr.

Nearly a year elapsed before there was any significant development, apparently because a comprehensive master plan was being developed by the City until late in 1970. Carroll. R. Dell, the City's Director of Planning and Public Works, and Robert E. Lakin, Judge Foster's engineer, came to Judge Foster's chambers in Baltimore with a petition for the rezoning to R-7500 of 76.95 acres of the Young Farm, then zoned agricultural. This was later revised, apparently because the remainder of the tract was already zoned R-10,000, and as filed on 8 December, Judge Foster as the petitioner sought a reclassification of the same area to R-10,000 (which permitted the same density as R-7500), or six dwelling units per acre. The proposal was approved by the Planning Commission on 10 December and was the subject of a public hearing before the Mayor and Common Council on 8 February 1971, which was attended by Judge Foster, who spoke in support of his proposal.

The rezoning was effected by an ordinance enacted on 8 March 1971. By that time the purchase option granted by the McLanahan Trust, which was for one year, if rezoning and installation of sewers had not been accomplished, had expired. Accordingly, Wheeler Holding and the McLanahan Trust entered into an extension agreement on 1 May 1971,

---

4. Mayor Hahn testified that it was not his practice to attend meetings of the Planning Commission because it might be viewed as a conflict of interest.

increasing the purchase price to $2,650.00 per acre and providing for the payment of taxes and other charges by Wheeler Holding. The agreement, as extended, was to expire 30 days following 1 May 1972.

Commencing in September, 1971, Judge Foster had a series of meetings with Harry L. Whitehead, vice president of Monumental Properties Acquisitions, Inc. (Monumental), looking toward a sale of his interest to Monumental. This culminated in an agreement of 6 December 1971, by which Wheeler Holding agreed to sell Monumental its option at a price of $1,150.00 per acre (this being in addition to the $2,650.00 per acre which Monumental would be required to pay the McLanahan Trust), after deducting 12 acres in computing the price to be paid to Wheeler Holding. Wheeler Holding, as agent for Judge Foster, was to secure the agreement of the McLanahan Trust to accept a five-year mortgage for approximately $357,500.00 as part of the purchase price. The agreement was subject to a number of conditions, among them approval of a planned unit development, permitting the construction of at least 1,130 dwelling units; the installation of permanent sewer facilities and an adequate treatment plant by the City, and a waiver by the City of its customary charge of $650.00 per unit for water and sewer connections.

A second agreement was entered into on the same date between Judge Foster, personally, and Monumental, which provided that upon final approval of the plan to build 1,130 dwelling units, Monumental would convey to Judge Foster 12 acres of the tract, upon payment by him of $31,800.00. As will be pointed out later, this 12 acre tract relates back to Judge Foster's proposal at his first appearance before the Council to give the City 10 acres for the erection of a civic center.

We now turn to the series of developments which occurred after the appearance of Monumental on the scene, events which we regard as particularly significant, not only because they occurred after Maryland's Canons and Rules of Judicial Ethics became effective on 1 July 1971, but because they have a direct bearing on what the Commission found Judge Foster's role to have been.

On 7 January 1972, Mr. Whitehead met with Mr. Dell, who had learned from Michael W. Riordan, Jr. of Monumental in November of 1971 of Monumental's interest in the matter. On 24 January 1972, Judge Foster wrote to Mayor Hahn. The introductory paragraph of the letter said:

"I am delighted to report to you that *we* are now nearing a point where *we* shall be able to go forward with the development of the Young farm and the other plans which we have discussed. Construction can start within a few months, but first *we* must resolve several matters which underly the entire program. I shall briefly outline these below so that you, the members of your City Council, and the Planning and Zoning Commission will have them at hand for the earliest possible consideration and action. *Our* target date to conclude these steps is March 15, 1972." (Emphasis supplied.)

What followed is described in the Commission's opinion, which has been only minimally edited:

"This letter of January 24, 1972 then outlined four items. The first was for the approval of a planned unit development for 1,146 dwelling units, ten acres for a planned business center and twelve acres for a civic center and Maryland Jaycee Headquarters. Request was also made, in connection with the 'planned unit development' that there be no limitations on any lot sizes except for those lots abutting Uniontown Road or 'other restriction that will interfere with the development except the existing City zoning Ordinance.' The second item dealt with a requirement for permanent sewer facilities to service the aforementioned 1,146 dwelling units, or the letting of contracts therefor by April 1, 1972. The third item requested permission for the selection of contractors for the public facilities, subject to City inspection, and that the City waive its standard

hook-up charges of $650.00 per dwelling unit. Item four sought an agreement from the City that the City would assume responsibility for all improvements or additions that might be legally required in connection with off-site storm drainage. In sum, this letter outlined Judge Foster's requirements as set forth in his agreement with Monumental of December 6, 1971. The letter of January 24, 1972, said: *'We* are excited about proceeding with all haste with *our* development . . .' and 'If it is necessary to meet with you, the Council, or City Officers, to finalize *our* plans and agreement, *we* shall make ourselves immediately available.' [Emphasis supplied.]

"Also on January 24, 1972, Mr. Dell wrote to Mayor Hahn stating: 'Judge Foster has a contract with Monumental Properties that *must be satisfied* by April 1, 1972.' [Emphasis supplied.] Mr. Dell then referred to the conditions and items set forth in Judge Foster's letter of January 24, 1972. We can only conclude that there must have been an immediate hand-delivery of Judge Foster's letter coupled with an immediate memo from Mr. Dell to the Mayor. From that time on matters seem to have proceeded with great dispatch. Thus on April 12, 1972, Mayor Hahn wrote to Judge Foster outlining the City's position with respect to the various issues raised. Three other matters occurred in the interim, namely: on March 23, 1972 the Mayor and Common Council passed a resolution reducing the width requirements of townhouses constructed on interior lots — a crucial matter in Judge Foster's view — and also reducing the minimum area therefor. Mayor Hahn's letter of April 12, 1972, to Judge Foster, states that this resolution was introduced at *'your'* request — referring to Judge Foster. On March 28, 1972, the Mayor and Common Council passed two ordinances which reduced the hook-up charges for sewer and water from $650.00 per unit

to $450.00 per unit and copies of these ordinances were sent to Judge Foster by Mr. Dell under a letter dated April 24, 1972. The ordinances produced substantial savings for Monumental; which changes, however, [applied] to any new developments and thus were not for the *sole* benefit of Judge Foster or of Monumental. However, the testimony is clear that the Young Farm was one of the first, if not the first, large scale developments to be considered by the City of Westminster and at the time there was only one other developer of substantial acreage. The significance of these matters can be seen from Judge Foster's letter of April 19, 1972, to Mayor Hahn in which Judge Foster said:

> 'Through your *special efforts*, all of the details in connection with the initial stages of the development of the Young Farm in the City of Westminster as a planned unit development have now been crystalized. You and Mr. Dell have my sincere thanks, deep appreciation, and admiration for your effectiveness.' [Emphasis supplied.]

On the same date, Judge Foster wrote to Mr. Whitehead saying:

> '. . .In the main, I would say *we* have a ten-strike; everything *we* have requested, with the exception of the save-harmless provision relating to storm water, has been granted and *we* conclude there should be no problem in dealing with the storm water through the use of holding ponds. I am delighted that with your great assistance *we have been able to accomplish such a remarkable feat.*' " [Emphasis supplied.]

Settlement between Judge Foster and Monumental, and Monumental and the McLanahan Trust was scheduled for 28

April 1972. At settlement, the first phase was the purchase of the Young Farm of 190.9857 acres at $2,650.00 per acre (the price stipulated in the extension agreement) by Monumental[5] from the McLanahan Trust, adjusted for settlement charges. This was accomplished by the delivery of $143,027.44 in cash and a purchase money mortgage in the amount of $359,339.50.

Next, Wheeler Holding transferred to Monumental Judge Foster's purchase option for a consideration of $1,150.00 per acre, less 12 acres, or $205,833.56, before adjustment for settlement costs. This was an amount made up of Monumental's deposit of $5,000.00, an additional cash payment of $88,224.96 and a second mortgage on the Farm for $112,239.00.

Finally, Judge Foster purchased 12 acres of the Farm from Monumental for $31,800.00. The deed to the 12 acres was held in escrow by Monumental's attorney under an agreement signed by Monumental and Judge Foster directing that the escrow should continue until Monumental's development plan was finally approved.[6] Mr. Whitehead testified that the purpose of this arrangement was to insure that the density permitted for the development would be computed on the basis of 190, and not 178, acres.

Later in 1972, after he had received the deed, Judge Foster made a gift of one acre of the 12 acre tract to the City and took an income tax deduction of $12,000.00 based on an appraisal of the property. He conceded that the balance of the tract might be used for commercial purposes, and if so utilized, had a potential value of $30,000.00 per acre.

Ultimately, Judge Foster paid a 10% real estate brokerage commission on the original option price of $2,500.00 per acre to Messrs. Lockwood and Cash in the total amount of $46,250.00, in accordance with the understanding they had reached at the time the option was negotiated. Neither the

---

**5.** At settlement, Monumental was acting through its nominee, Pinecrest Construction Company, Inc.

**6.** The deed was not recorded until about seven months thereafter.

McLanahan Trust nor Monumental paid any commission on the transaction.

After a three-day hearing at which 13 witnesses, including Judge Foster, testified, and some 60 exhibits were introduced, the Commission made the following findings of fact based upon what it found to be clear and convincing evidence, *see In re Diener & Broccolino, supra,* 268 Md. at 670, 304 A. 2d at 594: [7]

"1. By February 16, 1970, while a member of the Supreme Bench of Baltimore City, Judge Foster acquired an option in a valuable piece of property known as the Young Farm with no risk of any financial loss other than the possible forfeiture of a $1,000.00 deposit.

"2. At all times Judge Foster knew, or should have known, that the value of said property would be substantially enhanced if the property were rezoned, and if public utilities were made available to serve it.

"3. Judge Foster requested the Mayor of the City of Westminster, not previously known to him personally, to introduce him to the Planning and Zoning Commission of that City which the Mayor in fact did.

"4. The Director of Planning and Public Works of the City of Westminster was impressed with the fact of Judge Foster's official position.

"5. The Mayor, Common Council, Director of Public Works and Planning and the Members of the Planning and Zoning Commission knew of the judicial position held by Judge Foster.

"6. The City officials initially, and for some months, believed that Judge Foster would personally develop the property.

"7. Judge Foster personally attended at least

---

7. The findings are reproduced with a minimal amount of editing.

three meetings with various City officials to discuss the proposed development, including discussions of utilities and the zoning that would be required.

"8. Throughout the period involved, Judge Foster engaged in extensive correspondence concerning the project including letters to City officials. All of his correspondence was typed by his official secretary during her regular work hours. In addition, he made a number of telephone calls to City officials and had several meetings in his court Chambers.

"9. On December 6, 1971, Judge Foster, through Wheeler Holding entered into an Agreement of Sale with Monumental. This Agreement included various specified conditions pertaining to approval of a 'planned unit development' for 1,130 dwelling units, conditions pertaining to utilities, the waiving of standard hook-up charges for utilities and other matters. In connection with this Agreement, Monumental believed that one or more said conditions were unlikely of fulfillment so that Monumental had no substantial risk involved.

"10. Also on December 6, 1971, Judge Foster entered into a second agreement with Monumental by which Judge Foster was to pay Monumental the sum of $31,800.00 in exchange for which Monumental would deliver its agreement that upon final grant to Monumental of authorization to build 1,130 or more dwelling units it would convey 12 acres of the subject property to Judge Foster.

"11. When Judge Foster appeared with Mr. Whitehead of Monumental and 'presented him to the Planning and Zoning Commission' in an effort to have Monumental's conditions approved, he was undertaking to transfer to Mr. Whitehead the 'good will' that he had obtained through his introduction by Mayor Hahn to those members and from that time forward Judge Foster gave the appearance of acting as the 'agent' for Monumental Properties, and/or as a joint adventurer with it in the proposed

project. At this point Judge Foster definitely undertook to lend the influence of his name, and/or the prestige of his office, to advance the 'welfare' of Monumental Properties.

"12. At the request of Monumental Judge Foster wrote to Mayor Hahn requesting approval of the various conditions set forth in the Monumental contract.

"13. As a result of Judge Foster's request, the City on March 28, 1972, reduced hook-up charges for utilities from $650.00 per unit to $450.00 per unit. Judge Foster thereafter inquired by phone as to the interpretation of the ordinances that accomplished the reduction and was advised by Mr. Dell that his office would determine the type of connections required, and Mr. Dell saw 'no problem in being able to work out the proper methods for charging the appropriate fees.'

"14. On March 23, 1972, the City passed an ordinance reducing the minimum width and lot area for interior townhouses. Mayor Hahn's letter of April 12, 1972, states that this was done at Judge Foster's request.

"15. The City of Westminster approved conditions sufficient to satisfy Monumental to proceed to settlement. Judge Foster described the fulfillment of these conditions as due at least in part to 'special efforts' by Mayor Hahn and further described this accomplishment as a 'remarkable feat.'

"16. Settlement between the McLanahan Trust, Monumental and Judge Foster occurred on April 28, 1972. At that time the provisions of the contract between Judge Foster and Monumental were modified to the extent that Monumental executed a deed to Judge and Mrs. Foster for the 12 acres referred to above but this deed was delivered to Monumental's attorney under a written agreement to be held by Monumental's attorney in escrow

until Monumental's development plan 'has been finally ratified and approved by all required public authorities' at which time it would be delivered for recording.

"17. By reason of the escrow arrangement Judge Foster permitted himself to be placed in a position where it was necessary in his best interest to continue to cooperate with Monumental to obtain final approval from the City authorities for Monumental's plans even though all other aspects of the settlement between the parties have been consummated.

"18. All acts done by Judge Foster to advance his personal business interest of necessity benefited other interests as well, i.e., the McLanahan Trust by consummating a sale at $2,650.00 per acre for land previously valued at $1,600.00 per acre and by delivery to Monumental of a substantial tract of land ready for development under conditions satisfactory to it.

"19. The offer to convey 10 acres to the City was known by Judge Foster at the time to 'sweeten' the development proposals he submitted. Despite this, and despite his avowed intention to carry out that proposal, Judge Foster has not undertaken to bind himself in any legal manner to this promise which is conceded to be legally unenforceable. Accordingly, Judge and Mrs. Foster presently hold title to 11 acres of the subject property without any legal obligation to convey that property to either the City, to the Maryland Jaycees or for any other public use. The 11 acres have a present value of $12,000.00 per acre for a total value of $132,000.00 and a potential future value for commercial purposes of $30,000.00 an acre for a potential future total of $360,000.00. The acreage may be used for commercial purposes.

"20. The total minimum benefits flowing to Judge Foster as a result of the land transactions is

computed to be the sum of $261,239.00 which figure was arrived at as explained above.

"21. That Judge Foster as a judge of the Supreme Bench of Baltimore City is subject to assignment by the Chief Judge of the Court of Appeals under Maryland Rule 1202 to preside as a trial judge in any of the counties of this State, or as an appellate judge; that a judge may be appointed or elected to serve in one of the Circuits or Counties of this State does not preclude his assignment to preside as a judge in Carroll County nor does it preclude the applicability of the Canons to his acts in any subdivision of this State."

The Commission said in conclusion:

"Perhaps these general rules [proscribing an appearance of impropriety] were summarized as well as possible in Judge Smith's dissenting opinion in *In Re Diener and Broccolino, supra,* [268 Md. at 698, 304 A. 2d at 607,] where he stated: 'Courts, be they high or low, should and must be like Caesar's wife, above suspicion. Any other standard is one which undermines the trust and confidence of the average citizen in his government.'

"Viewed in this light, we can only conclude that to the average person, Judge Foster's activities created an appearance of impropriety. This appearance may be seen simply from such facts as the Mayor's personal introduction of the Judge at the Judge's request, the Judge's introduction of Monumental's representative (Mr. Whitehead) to the Planning and Zoning Commission, the correspondence addressed to Judge Foster using his official title, the hand delivery of the zoning petition for Judge Foster to sign, and the relative rapidity with which events seemed to move after Judge Foster's request to the Mayor of January 24, 1972. We have concluded after a full evidentiary hearing that there was no actual

wrongdoing but we are compelled to the conclusion that there was the appearance of impropriety. To the average person inspecting the Land Records of Carroll County and the official records of its City Officials there emerges the picture of a judge engaging in a speculative land venture solely for economic gain, the success of which depended upon official action of the City in terms of zoning, utilities and other 'concessions' which were obtained and which resulted in substantial profits to the judge. It was inevitable that this would cause reasonable suspicion and distrust in the public view of the particular judge. We therefore conclude as follows with respect to the Canons and Rules set forth in the notice delivered to Judge Foster:

"1. Maryland Canon IV (original ABA Canon 4) — While this Canon deals with the avoidance of impropriety it is restricted to the area of a judge's 'official conduct.' The matters involved did not relate to Judge Foster's official actions or conduct and therefore there is no violation of this Canon.

"2. Maryland Canon VII (original ABA Canon 7) — This Canon relates to the prompt performance of a judge's duties. While there is evidence, referred to above, of extensive correspondence, meetings and numerous telephone calls, as well as the transcription by the judge's publicly-paid secretary of a great amount of correspondence, we find a lack of clear and convincing evidence that the time devoted to this project interfered with the prompt performance of the duties Judge Foster was performing and thus, find no violation of this Canon.

"3. Maryland Canon VIII (original ABA Canon 8) — This Canon deals with court organization and the prompt dispatch of the court's business. There is no clear and convincing evidence of any violation of this Canon.

"4. Maryland Canon XXIII (original ABA Canon 24) — This Canon deals with the acceptance of inconsistent duties or incurring obligations which interfere or appear to interfere with the judge's official functions. Again, there is no clear and convincing evidence to conclude that this Canon was violated.

"5. Maryland Canon XXIV (original ABA Canon 25) — This Canon requires that a judge should avoid giving ground for any 'reasonable suspicion' that he is using the power or prestige of his office to persuade others to contribute to the success of private business ventures. The judge is enjoined from pursuing a course of conduct 'as would justify such suspicion.' For the reasons set forth above, we conclude that there was a violation of this Canon.

"6. Maryland Rules of Judicial Ethics, Rule 6 — This Rule relates to holding an office in any business venture if the holding interferes with the performance of official duties. For the reasons indicated in connection with Canon IV we find no violation of Rule 6.

"7. Maryland Rules of Judicial Ethics, Rule 8 [8] — This Rule provides that a judge shall not 'directly or indirectly lend the influence of his name or the prestige of his office to aid or advance the welfare of a private business or permit others to do so . . . .' We find that from the circumstances described in the evidence that Judge Foster's conduct violated Rule 8."

Immediately after stating these conclusions, the Committee made the following recommendation:

"Having found violations of Canon XXIV and Rule 8, it is apparent that this matter cannot be dismissed. Accordingly, we deny the Motion to Dismiss made on behalf of Judge Foster, and we

---

[8.] Rule 9 since 15 February 1974.

must recommend either to censure or to remove. We are concerned that Maryland Rule 13 [9] of the Rules of Judicial Ethics provides that a violation of any of the Rules 'is conduct prejudicial to the proper administration of justice.' The majority opinion in *In Re Diener and Broccolino, supra,* held that a finding of conduct prejudicial to the proper administration of justice compelled removal of those judges under the facts there presented. As in many other areas, there are degrees of impropriety. The Commission is convinced that there is a substantial and qualitative difference between the conduct found in *Diener and Broccolino [,supra,]* and the present situation in that in the former, judges in their official capacity while presiding in the Traffic Court of Baltimore City improperly disposed of cases then pending in their courts.

"We have affirmatively found here that there was no official misconduct on the part of Judge Foster; if he were a real estate developer he might be congratulated on his success, but he is not; he is a judge and there is clear and convincing evidence that his conduct gave the appearance of impropriety. Judge Foster displayed an insensitivity to the judicial position he holds and the prestige thereof, particularly in view of the evidence that he was alerted to the ethical question involved by the inquiry raised by Mr. Luetkemeyer, Jr.; further he attempted to transfer unto Monumental Properties the 'good will' and his own prestige which had been established and engendered through his personal introduction by Mayor Hahn — at his specific request. Thus, he undertook to lend the influence of his name and the prestige of his office in furtherance of the private business of Monumental Properties.

"Because of the lack of evidence of any official

---

Now Rule 14.

judicial misconduct on the part of Judge Foster and because of the very nature of the provisions of Canon XXIV — the avoidance of 'giving ground for any reasonable suspicion that he is utilizing the power or prestige of his office,' and the nature of Rule 8 of the Maryland Rules of Judicial Ethics — the 'lending of the influence of his name or the prestige of his office to aid or advance the welfare of any private business' — the majority of the Commission finds that any recommendations for his removal from office would be unwarranted and too drastic under all the circumstances surrounding this transaction and accordingly recommends his censure."

The Commission concluded that while there was no actual wrongdoing there was an appearance of impropriety, *see Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U. S. 145, 147-50 (1968), since it gave ground for a reasonable suspicion in violation of Canon XXIV [10] of our Canons of Judicial Ethics and of Rule 8 (now Rule 9) of our Rules of Judicial Ethics.[11] The Commission noted that Rule 13 (now Rule 14) makes any violation of the Rules of Judicial Ethics conduct prejudicial to the proper administration of justice. Five members of the Commission recommended that

---

[10]. This canon, which was identical with Canon 25 of the Canons of Judicial Ethics of the American Bar Association at the time we adopted it on 4 May 1971, effective 1 July 1971, provides:

"A judge should avoid giving ground for any reasonable suspicion that he is utilizing the power or prestige of his office to persuade or coerce others to patronize or contribute, either to the success of private business ventures, or to charitable enterprises. He should, therefore, not enter into such private business, or pursue such a course of conduct, as would justify such suspicion, nor use the power of his office or the influence of his name to promote the business interests of others; he should not solicit for charities, nor should he enter into any business relation which, in the normal course of events reasonably to be expected, might bring his personal interest into conflict with the impartial performance of his official duties."

[11]. "A judge shall not, directly or indirectly, lend the influence of his name or the prestige of his office to aid or advance the welfare of any private business or permit others to do so. He shall not personally solicit funds for any purpose, charitable or otherwise."

Judge Foster be censured. One member recommended that he be removed. One member joined in the Commission's recommendation but dissented from that portion of finding 11 which found that "Judge Foster gave the appearance of acting as the 'agent' for Monumental . . . ."

When the Commission's report reached this Court, we set the matter for hearing. Exceptions filed in behalf of Judge Foster challenged the Commission's findings (i) that his actions in the Carroll Young Farm transaction created an appearance of impropriety, and (ii) that he acted as an agent for Monumental Properties, Inc. After the original hearing in this Court, we set the matter for reargument, and directed that counsel address themselves to two questions: (i) the meaning of the term "reasonable suspicion" as used in Canon XXIV of the Maryland Canons; and, (ii) whether that which would be a violation of the Maryland Canons had it occurred subsequent to the effective date of those Canons but which occurred prior to 1 July 1971, but after the adoption of the Canons by the American Bar Association in 1924, 24 A.B.A. Rep. 65-71 (1924), and by the Maryland State Bar Association in 1953, 58 Transactions of Md. St. B. Ass'n 239-52 (1953), could be a valid basis for disciplinary action against a Maryland judge.

At the first argument, counsel for Judge Foster took the position that there could be no appearance of impropriety because there was no indication that the concessions granted Judge Foster would not have been accorded to any other responsible developer, particularly since there was evidence that an adjoining tract had been similarly rezoned sometime prior to the rezoning of the Young Farm. It seems to us, however, that this is a shaft which falls far short of the mark.

The test, of course, is not necessarily whether Judge Foster, by reason of his position and prestige, was able to achieve a result which another might not have accomplished, but rather whether a reasonable man would be justified in suspecting that the result which Judge Foster achieved was achieved because of his position and prestige.

A second point raised at the first hearing springs from

counsel's reading of the Commission's finding 11 as a finding that Judge Foster was the agent of Monumental Properties, Inc., despite Judge Foster's and Monumental's categorical assertions to the contrary. In point of fact, the Commission found that "Judge Foster *gave the appearance* of acting as the 'agent' for Monumental Properties, and/or as a joint adventurer with it in the proposed project." (Emphasis supplied.)

Based on our independent review of the record, we think that the Commission's finding in this regard was supported by clear and convincing evidence. From the moment that Monumental became interested in the transaction, and continuing until the conditions which it had imposed were met, Judge Foster first made possible the assumption that Monumental's role was that of his financial backer, and later gave the impression that his undertaking was a joint one with Monumental. Such was clearly not the case, since once it became apparent to him that Monumental would exercise its option, Judge Foster's interest was merely that of a mortgagee, and that of the owner of the 12 acres which he planned to give to the City.

At the second hearing, Judge Foster's counsel took the position that the Canons and Rules adopted by our Rule 1231, effective 1 July 1971, were inapplicable to any conduct prior to the effective date of that Rule.

It seems to us that there are two answers to this argument. The first is that it has been possible to discipline a Maryland judge for "misconduct while in office" or "conduct prejudicial to the proper administration of justice" since November, 1966, when sections 4A and 4B were first added to Article IV of the Constitution.[12] It is significant that the Supreme Court of California took this view in *Geiler v. Commission on Judicial Qualifications*, 10 Cal. 3d 270, 281-84, 515 P. 2d 1, 8-9, 110 Cal. Rptr. 201, 208-09 (1973),

---

12. Under the 1966 amendment, Chapter 773 of the Laws of 1965, a report and recommendation of the Commission on Judicial Disabilities would have been acted upon by the General Assembly; under the 1970 amendment, Chapter 789 of the Laws of 1969, such a recommendation would be acted upon by this Court.

and that the same holding was at least implicit in this Court's decision in *In re Diener & Broccolino, supra.* That Judge Foster was Chairman of the Judicial Conference in 1970, the year in which the American Bar Canons were adopted in principle, as well as a member of the first Commission on Judicial Disabilities, should not be overlooked.

While "conduct prejudicial to the proper administration of justice," Constitution, art. IV, § 4B (b), is difficult of definition, *In re Diener & Broccolino, supra,* 268 Md. at 671, 304 A. 2d at 594, Judge Foster could have found objective standards in the Canons of Judicial Ethics which had been formulated by the American Bar Association as well as in the body of opinions of the Association's Standing Committee on Professional Ethics, and could readily have assayed his plans against these standards. *See In re Lombard,* 242 Md. 202, 218 A. 2d 208 (1966); *cf. Space Aero Prods. Co. v. R. E. Darling Co.,* 238 Md. 93, 120, 208 A. 2d 74, 88, 699, *cert. denied,* 382 U. S. 843 (1965).

A similar point was made in *In re Troy,* Mass., 300 N.E.2d 159, 189-90 (1973), because the new American Bar Code of Judicial Conduct did not become effective in Massachusetts until 1 January 1973. The Supreme Judicial Court dealt with the contention in similar fashion:

> "The conduct of Judge Troy is fairly to be assessed by reference to the Canons of Judicial Ethics which, in the period in which he served as a judge, stood as a generally accepted guide. These canons, adopted by the American Bar Association in 1924 . . . stated, 'A judge should avoid giving ground for any reasonable suspicion that he is utilizing the power or prestige of his office to persuade or coerce others to patronize or contribute, either to the success of private business ventures, or to charitable enterprises. He should, therefore, not enter into such private business . . . nor . . . enter into any business relation which, in the normal course of events reasonably to be

expected, might bring his personal interest into conflict with the impartial performance of his official duties' (Canon 25). These canons of long standing are echoed in the Code of Judicial Conduct effective in this Commonwealth under court rule on January 1, 1973 . . . ."

Assuming, without deciding, that Judge Foster is right when he says that his conduct was not regulated by our Canons and Rules before they became effective on 1 July 1971, there remains another hurdle to clear. It should have been apparent to him that his activity after that date must be circumspect. Rule 15 (formerly Rule 14) provides for the creation of a Judicial Ethics Committee, a committee authorized to issue advisory opinions which could be relied upon by any judge who took the precaution of seeking a protective cloak, if, indeed, one would be available.[13]

Judge Foster was no novice in this field. In addition to his service on the first Judicial Disabilities Commission, he had been active in the American Bar Association, and in the National Conference of Trial Judges, where he had served as president. Why he remained insensitive to his problem is

---

**13.** Rule 15 provides:

"The Chief Judge of the Court of Appeals shall annually appoint a Judicial Ethics Committee consisting of five (5) members as follows: One each from the Court of Appeals, the Court of Special Appeals, the Circuit Courts (including the Supreme Bench of Baltimore City), the District Court, and one member at large from any of the above courts, one of such members to be designated as chairman.

"Any judge may in writing request the opinion of the Committee on the proper interpretation of these Canons and Rules and compliance with the ruling of a majority of the Committee shall be a complete protection of such judge from any charge of violation.

"Such opinion shall be given in writing and filed with the Secretary of the Maryland Judicial Conference.

"In an emergency, requests for an opinion may be directed to the Secretary, who may consult by telephone, or otherwise, with the Committee. The opinion of a majority shall also be a protection to such judge provided, however, that such informal opinion shall not preclude a different opinion when greater opportunity for reflection is presented. The inquiring judge shall be promptly notified in writing of any such different opinion."

difficult to fathom, particularly after Mr. Luetkemeyer's inquiry at the threshold of the negotiation.

By way of illustration, Canons 5C (1) and 5C (2) of the American Bar Association's new Code of Judicial Conduct (adopted 16 August 1972) are addressed to financial and business dealings and the holding and management of investments by a judge:

"(1) A judge should refrain from financial and business dealings that tend to reflect adversely on his impartiality, interfere with the proper performance of his judicial duties, exploit his judicial position, or involve him in frequent transactions with lawyers or persons likely to come before the court on which he serves.

"(2) Subject to the requirements of subsection (1), a judge may hold and manage investments, including real estate, and engage in other remunerative activity, but should not serve as an officer, director, manager, advisor, or employee of any business."

Professor E. Wayne Thode, who was the Reporter for the Special Committee which formulated the Code, makes the following comment in E. W. Thode, Reporter's Notes to Code of Judicial Conduct 80-81 (1973):

"Old Canons 24 and 25, setting the standards for a judge's business activities, do not forbid engaging in business activities; they merely caution against obligations that are inconsistent with judicial duties and against 'such a course of conduct, as would justify such suspicion [that the judge was utilizing the power or prestige of his office to persuade or coerce others to patronize a private business].' "

* * *

"Despite having received some pleas for continuing the old standards, the Committee

remained steadfast in its opinion that the old standards are too permissive. Subsection C (1) of Canon 5 of the *Code* provides that a judge should refrain from financial and business dealings that tend to reflect adversely on his impartiality or that interfere with the proper performance of his judicial duties. These two general standards are followed by two others that relate directly to the connection between the judicial office and a judge's business activities. A judge should not exploit his judicial position to gain a business advantage, nor should he engage in business dealings that would involve him in frequent transactions with lawyers or persons likely to appear in his court. The aim is to prevent the appearance to litigants, lawyers, and the public that patronizing the business in which a judge is actively involved will work to the advantage of the litigant, or that failure to patronize the business will work to his disadvantage. Canon 5C (2) states, furthermore, that a judge should not serve as an officer, director, manager, advisor, or employee of any business."

It would seem that as regards investments in real estate, the critical question is whether a judge can maintain a low profile. This is reflected in Advisory Opinion No. 30, 18 February 1974, issued by the Advisory Committee of the Judicial Conference of the United States, which says in part:

"A judge may hold and manage investments, including real estate, subject to the limitations of Canon 5C (1). He should not, however, personally manage or operate any business, including a farm or ranch. This would not preclude his participation in decisions with respect to the purchase, sale and use of land, the purchase of equipment and supplies, or the sale of farm produce or livestock from a farm or ranch which he owns but is operated by a farm manager or hired man." 42 U.S.L.W. 2495 (Mar. 26, 1974).

The suggestion that a judge may establish policy and participate in decisions, while actual management is left to others, would surely have an a fortiori application to any development of real estate for speculative purposes.

The anomaly in this case is that Judge Foster, although the American Bar Association's Code of Judicial Conduct had not been adopted at the time, charted what would have been under the Code a proper course only to abandon it almost immediately. For whatever reason, he arranged for Wheeler Holding to acquire the option. Had he then arranged for Wheeler Holding to retain counsel or a real estate consultant who could have then employed engineers and planners, there would have been no infringement on time which might otherwise have been devoted to the performance of judicial duties. Moreover, there is every likelihood that the development plan could have been presented to the City officials and approved by them without his interest ever becoming known. When he personally and publicly assumed a command responsibility in the furtherance of the project, he embarked on a course likely to collide with the prohibition contained in Rule 8 (now Rule 9).

In almost every case of this sort, there is no litmus test, but rather an elastic standard based on questions of degree. Certainly, when a course of conduct persists over a period of two years and involves personal appearances, continuing correspondence and frequent telephone calls, an atmosphere is created where ground is given for the reasonable suspicion referred to in Maryland Canon XXIV.

The second issue raised at reargument was the meaning of the phrase "reasonable suspicion" as used in Maryland Canon XXIV. While the phrase was not imported into the new Code of Judicial Conduct,[14] it had a long history in Canon 25 of the American Bar Association Canons of Judicial Ethics. A dictionary definition of "suspicion" includes the "imagination or apprehension of something wrong or

---

**14.** It should be noted, however, that the phrase "appearance of impropriety" appears in the new Code in Canons 2 and 6.

hurtful, without proof, or on slight evidence," Webster's New International Dictionary 2542 (2d ed. 1944). Many years ago, the Supreme Court of Wisconsin put it differently: "That state of mind which in a reasonable man would lead to inquiry is called mere 'suspicion,' " *Stuart v. Farmers Bank,* 137 Wis. 66, 73, 117 N. W. 820, 822 (1908).

We do not find the phrase any more nebulous or less objective than the reasonable and prudent man test which has been a part of our negligence law for centuries.

> "The whole theory of negligence presupposes some uniform standard of behavior. Yet the infinite variety of situations which may arise makes it impossible to fix definite rules in advance for all conceivable human conduct. The utmost that can be done is to devise something in the nature of a formula, the application of which in each particular case must be left to the jury, or to the court. The standard of conduct which the community demands must be an external and objective one, rather than the individual judgment, good or bad, of the particular actor; and it must be, so far as possible, the same for all persons, since the law can have no favorites. At the same time, it must make proper allowance for the risk apparent to the actor, for his capacity to meet it, and for the circumstances under which he must act.
>
> "The courts have dealt with this very difficult problem by creating a fictitious person, who never has existed on land or sea: the 'reasonable man of ordinary prudence.' Sometimes he is described as a reasonable man, or a prudent man, or a man of average prudence, or a man of ordinary sense using ordinary care and skill. It is evident that all such phrases are intended to mean very much the same thing. The actor is required to do what such an ideal individual would be supposed to do in his place." W. Prosser, The Law of Torts § 32, at 149-50 (4th ed. 1971).

Given a certain set of facts, would a reasonable person be justified in suspecting that a judge might be "utilizing the power or prestige of his office to persuade . . . others to . . . contribute . . . to the success of private business ventures . . ."? We do not look upon this as too evanescent to form the basis of a standard against which a course of conduct may be tested. Nor do we find the standard unconstitutionally vague, *see Keiser v. Bell,* 332 F. Supp. 608, 614-15 (E.D. Pa. 1971) (provision of Pennsylvania Constitution permitting removal of judges for, *inter alia,* "misconduct in office" not unconstitutionally vague), and *Sarisohn v. Appellate Division,* 265 F. Supp. 455, 458-59 (E.D.N.Y. 1967) (reaching a result similar to that reached in *Keiser* where New York Constitution permitted removal of a judge "for cause"). In *Sarisohn,* Judge Bartels said in the course of his opinion:

> "The words 'for cause' mean for a cause to be enumerated and specified in each particular instance so that the defendant may be duly notified and adequately prepared to defend the charges. It does not mean that a judge may be removed for 'cause' without more and without an enumeration of the charges constituting the alleged 'cause.' It would be impossible to enumerate in any statute all the possible grounds and circumstances justifying the removal of a judicial officer. Guidelines may be found in the Canons of Ethics, applicable to both attorneys and judges, adopted by the American Bar Association and other bar associations, and also in the general moral and ethical standards expected of judicial officers by the community. 'For cause' has been defined in several cases involving the removal of judicial officers and they provide a reasonable person with a competent definition of this phrase." 265 F. Supp. at 458 (footnotes omitted).

*See also Napolitano v. Ward,* 317 F. Supp. 79, 81 (N.D. Ill. 1970); *Friedman v. State,* 24 N.Y.2d 528, 249 N.E.2d 369, 301 N.Y.S.2d 484, *modified,* 25 N.Y.2d 905, 252 N.E.2d 131, 304 N.Y.S.2d 597 (1969), *appeal dismissed,* 397 U. S. 317 (1970);

*cf. Lehmann v. State Bd. of Pub. Accountancy*, 263 U. S. 394, 398 (1923); *Napolitano v. Ward*, 457 F. 2d 279, 284 (7th Cir. 1972), *aff'g* 317 F. Supp. 83 (N.D. Ill. 1970), *cert. denied*, 409 U. S. 1037 (1972), *rehearing denied*, 410 U. S. 947 (1973).

While we have found all of the Commission's findings to be supported by clear and convincing evidence, it is our view that only findings 3-7 and 11-12 are relevant to the Commission's conclusion that there was a violation of Maryland Canon XXIV and Maryland Rule 8 (now Rule 9).

> *For the reasons set forth, it is this 29th day of April, 1974 by the Court of Appeals of Maryland, ordered that the recommendation of the Commission on Judicial Disabilities be, and it is hereby, accepted; and it is further ordered that Judge Dulany Foster be, and he is hereby, censured.*

*Smith, J., dissenting:*

As I see it, the issue before the Court is not whether any of us would or would not have engaged in the activity in Carroll County in which Judge Foster engaged, but whether there is a constitutional basis for censuring him for his acts and, if there is such a constitutional basis, whether his acts amount to conduct prejudicial to the administration of justice.

I call attention, as I did in my dissenting opinion in *In re Diener and Broccolino*, 268 Md. 659, 304 A. 2d 587 (1973), to the statement in the note *Remedies for Judicial Misconduct and Disability: Removal and Discipline of Judges*, 41 N.Y.U.L. Rev. 149 (1966):

"[T]he difficulty with public reprimand is that it weakens public confidence in the judiciary and the respect of attorneys for the particular judge." *Id.* at 173.

For that reason, we should be as slow to censure as to remove.

The starting point for this inquiry must be the Constitution of Maryland, Art. IV, § 4B (b) which provides:

> "Upon recommendation of the Commission . . . the Court of Appeals, after a hearing and upon a finding of *misconduct* while in office, or of persistent failure to perform the duties of his office, or of *conduct* prejudicial to the proper administration of justice, may remove the judge from office or may censure him . . . ." (Emphasis added.)

The key word, it seems to me, is conduct. In drafting the constitutional provision it must have been realized that this standard is rather vague. As a practical effort to provide fundamental fairness for those members of the judiciary charged by the Commission on Judicial Disabilities (the Commission), the drafters required that as a minimum there must be *conduct* which is prejudicial to the proper administration of justice, not a reasonable suspicion of conduct prejudicial to the administration of justice or even conduct which creates a reasonable suspicion. It must be the *conduct itself* which is prejudicial. Clearly this calls for an affirmative finding that the judge actually did something improper. This is highlighted by what the Commission cites as the definition of reasonable suspicion — "imagination or conjecture of the existence of something evil or wrong without proof; apprehension of guilt or fault on slight grounds or without clear evidence." Surely the drafters must have realized that to condemn someone "without proof" or on "conjecture" would shock the conscience and run afoul of our system of justice. The minimal requirement for wrongdoing is that a reasonable judge in his position would know that what he did, although not wrong in and of itself, would be prejudicial to the administration of justice because of the aura of misconduct created.

The Commission and the majority find that acts of Judge Foster which took place prior to July 1, 1971, the effective

date of Canon XXIV of the Maryland Canons of Judicial Ethics and Rule 8 (Rule 9 since February 15, 1974) of the Maryland Rules of Judicial Ethics, were proscribed by that canon and rule.

To put this matter in proper perspective, I set forth the pertinent portions of the canon and rule here in question. Canon XXIV states:

> "A judge should avoid giving ground for any reasonable suspicion that he is utilizing the power or prestige of his office to persuade or coerce others to patronize or contribute . . . to the success of private business ventures . . . . He should, therefore, not enter into such private business, or pursue such a course of conduct, as would justify such suspicion, nor use the power of his office or the influence of his name to promote the business interests of others . . . ."

Rule 9 states:

> "A judge shall not, directly or indirectly, lend the influence of his name or the prestige of his office to aid or advance the welfare of any private business or permit others to do so. . . ."

To censure Judge Foster under a canon and under a rule which did not become effective under the order of this Court until July 1, 1971, I find repugnant to traditional concepts of Anglo-American jurisprudence and elementary fairness. It was precisely such conduct that led our forefathers to provide in Art. 15 of the Declaration of Rights in the Maryland Constitution of 1776:

> "That retrospective laws, punishing facts committed before the existence of such laws, and by them only declared criminal, are oppressive, unjust, and incompatible with liberty; wherefore no *ex post facto* law ought to be made."

A similar statement is found in Art. 17 of our present Declaration of Rights, with the addition that no

"retrospective . . . restriction [should] be imposed, or required." *See Constitutional Revision Study Documents of the Constitutional Convention Commission of Maryland* 608-09 (1968). Thus, our Maryland provision was adopted 11 years before the similar prohibition in the Constitution of the United States, Art. 1, § 9.

It is true, as the majority states, that since November, 1966, it has been possible to discipline a Maryland judge for "misconduct while in office" or "conduct prejudicial to the proper administration of justice." Were there an allegation here that prior to July 1, 1971, Judge Foster had decided a case or cases by reason of the importunings of his friends or if there were allegations that prior to that date he had decided a case or cases in which he was personally involved, one would not have the slightest difficulty in concluding that such acts would constitute misconduct in office or would be prejudicial to the administration of justice, because such acts on the part of any jurist traditionally have been regarded as improper. As I shall point out in my discussion of vagueness, however, just what conduct Canon XXIV and the present Rule 9 attempt to proscribe has not been completely and readily understood by the legal profession or the public generally.

The majority opinion refers to *In re Troy*, Mass., 300 N.E.2d 159 (1973), and the comment there that "[t]he conduct of Judge Troy [was] fairly to be assessed by reference to the [A.B.A.] Canons of Judicial Ethics which, in the period in which he served as a judge, stood as a generally accepted guide." The activities there involved were such as might generally be recognized as forbidden. Judge Troy was found, among other things, to have made bail determinations improperly; to have "wilfully and for a prolonged period of time participated in filling a tidewater area in an illegal manner"; to have frequently and wrongfully worked during regular court hours at a project in which he had a personal financial interest; to have used court officers to do substantial work at that project during regular court hours at the expense of the public and for the personal financial benefit of himself and his family; to have

given false testimony under oath, including testimony before the Supreme Judicial Court of Massachusetts which it characterized as "a deliberate, calculated, persistently repeated lie;" and to have failed "to give full time to the performance of his duties as a judge," his "usual working hours at court [being] about 10 A.M. to 1 P.M. while the other full-time judge at the Dorchester court consistently worked a full day at the court house until the late afternoon." Such conduct is a far cry from that with which we are here concerned. If the pre-July 1, 1971, conduct of Judge Foster were in this category, I would see no problem. The conduct of Judge Troy fell into categories traditionally understood to be improper and the case was decided on that basis.

Nowhere has the majority attempted to come to grips with a definition of the term "reasonable suspicion" as used in Canon XXIV, that canon which Judge Foster stands accused of violating, which is the crux of this case. No cases defining this term have been cited. In fact, I strongly doubt that there are any involving an interpretation of this term as used in the canon. I could find none.

We are familiar with the term "probable cause" in its civil context, as in malicious prosecution. In *Banks v. Montgomery Ward & Co.*, 212 Md. 31, 128 A. 2d 600 (1957), a malicious prosecution case, Judge Hammond said for the Court on that subject:

> "Probable cause is a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing that the accused is guilty. *Johns v. Marsh*, 52 Md. 323, 335; *Nance v. Gall*, 187 Md. 656, 669. Mere belief, however sincere, is not sufficient. There must be such grounds of belief founded upon actual knowledge of facts as would influence the mind of a reasonable person. *Pessagno v. Keyes*, 143 Md. 437."
> *Id.* at 39.

On the same subject Judge Delaplaine said for the Court in *Kennedy v. Crouch*, 191 Md. 580, 62 A. 2d 582 (1948):

> "Probable cause is a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in his belief that the person accused is guilty of the offense with which he is charged. *Nance v. Gall,* 187 Md. 656, 669, 50 A. 2d 120, 126. What facts are sufficient to show want of probable cause in any case is, of course, a question of law for the court; but whether such facts are proved by the evidence is a question for the jury. *Cooper v. Utterbach,* 37 Md. 282, 317; *Campbell v. Baltimore & Ohio R. Co.,* 97 Md. 341, 344, 55 A. 532; *Stansbury v. Luttrell,* 152 Md. 553, 556, 137 A. 339; *Stewart v. Sonneborn,* 98 U. S. 187, 25 L. Ed. 116, 119." *Id.* at 590.

If we search for a definition of the term "reasonable suspicion" and thereby equate that term, as used in the canon, with probable cause in the sense of a malicious prosecution case, I would be of the opinion that the evidence here does not provide "circumstances sufficiently strong in themselves to warrant a cautious man in believing that [Judge Foster] is guilty" of "utilizing the power or prestige of his office to persuade or coerce others to patronize or contribute . . . to the success of [his] private business ventures." His neighbor across the road by the name of Jones, conceded to be without special influence in the community, obtained rezoning for his tract before Judge Foster was ever approached to buy the one here in controversy. Carroll Dell, the Director of Planning and Public Works for the City of Westminster, testified that after the Foster application the local planning commission "deliberately put off [action] to see what the consultant would recommend in the way of zoning of this parcel of property." The planner had been hired in February of 1969. His work was already in progress when Judge Foster appeared in January of 1970. The final recommendation of the planner was received in early 1971. The completed comprehensive plan for Westminster called for this land to be zoned R-10,000. The Director of Planning explained that there was no difference in density per acre in a planned unit

development under the zoning ordinance between an R-7500 zone and an R-10,000 zone. The rezoning was not accomplished until after that planner's report was received.

Relative to the change in the minimum width of townhouses from 25 feet, Mr. Dell testified that the engineers, who were doing the work for Monumental Properties Acquisitions, Inc. (Monumental), and another development in the area by another corporation, "picked this point up about the 25 feet and they came to us right away, came to me and called, 'What is this requirement about 25 feet on a townhouse?' They said, 'We are doing the Meyerberg development and we are doing The Greens,' which is what this is referred to now. 'We can't possibly live with that kind of a requirement as an engineer.'" Dell and his staff "check[ed] around with other areas [and] found that most townhouse widths were 16 feet, 18 feet, 20 feet, some 22." He then explained:

> "We finally came to a conclusion that we felt that a fair width would be 20 feet in view of the fact that we had other townhouses built in the City within five years of only 12 feet. So we felt that we were really upgrading our townhouse width and standard. Mr. Meyerberg wasn't very happy about this because he wanted 18, 16, and 18 ft. widths. But we felt that we had to pick a standard."

As of the time of his testimony Dell said that Myerberg, the promoter of the other development, had 150 dwellings under construction, while Monumental, the promoter of the area with which Judge Foster was connected, had not yet broken ground. The amendment provided that interior units might be 20 feet wide with a limit of six to a group, with the requirement for the end units remaining at 25 feet.

Dell also explained the matter of sewer and water connection charges. He said the former practice had been to connect without charge. Then a charge of $325 for water connection was adopted. In January, 1972, the $325 charge for both water and sewer (total of $650) was put into effect. He further explained:

"This, of course, was ample, at that time, to cover costs. The only thing we were trying to do with a connection charge is cover the costs of installing it. You don't try to make money on connection charges. You make your money on benefit assessment charges or front foot assessment. That is the normal way of doing it. In fact, some counties only charge $150 for hook up charges. It is to offset actual construction costs. Monumental complained that this was an unfair policy. That we were charging $325 for something that only cost them or their contractor $140 to $160 to put in at the time they laid the mains. Well, this made a lot of sense. Our ordinance was, you know, was adopted without taking into account with the fact that a developer would be coming in some day laying their own mains, which we do require. We won't lay any mains for any developers. We make them extend all their own lines and pay for them and give them to us, lock, stock and barrel with no buy back agreements or anything. So this point did not seem like it was too far out of line. And there was meetings, several meetings held. The Council discussed it and we did some further research on it and we found that, probably, our $325 was unfair to a developer that was going to pay the cost of everything to put it in. So we reconsidered this point and agreed that we would go to $225 connection fee, if the service lines were installed at the time the mains were put in for a developer, if he was paying for the mains. A revision to our water and sewer ordinance was both drafted and both adopted by the Council to change this one item."

He made plain that the developer who pays only $225 for the connection is obliged to extend the mains and give them to Westminster.

While it is admitted that this is not a criminal proceeding and there is a strong State interest in maintaining the judiciary's reputation for integrity, nevertheless, a man's

reputation and livelihood are at stake. Surely, his interest in preventing the attachment of the stigma of censure is significant. For this reason, there is justification for a certain degree of comparison with the criminal justice system. The State's interest in preventing murder and rape is strong. However, this interest does not permit conviction on a reasonable suspicion. In fact, we do not even permit an arrest or a search on a reasonable suspicion; there must be probable cause. All that is allowed is a limited stop and frisk to protect a police officer. *Terry v. Ohio,* 392 U. S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968). Admittedly, reasonable suspicion is some form of standard, but would the Constitution permit our censure or removal of a judge on the basis of the same standard which excuses stop and frisk? I think not. I think if we use any definition of reasonable suspicion other than probable cause, as previously mentioned, then questions arise as to whether the term is so vague as to be unconstitutional.

Vagueness was discussed for this Court by Judge Prescott in *State v. Cherry,* 224 Md. 144, 167 A. 2d 328 (1961), where he said:

"The rule as to whether a penal statute is so vague and indefinite as to run afoul of the Due Process Clause of the Fourteenth Amendment (and Article 23 of the Maryland Declaration of Rights) has been stated many times by many courts. Perhaps, one of the most lucid expositions thereof is that of Mr. Justice Sutherland in *Connally v. General Construction Company,* 269 U. S. 385, 391, wherein it is said:

'That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an

act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law * * *.

'The question whether given legislative enactments have been thus wanting in certainty has frequently been before this court. In some of the cases the statutes involved were upheld; in others, declared invalid. The precise point of differentiation in some instances is not easy of statement. But it will be enough for present purposes to say generally that the decisions of the court upholding statutes as sufficiently certain, rested upon the conclusion that they employed words or phrases having a *technical* or *other special* meaning, well enough known to enable those within their reach to correctly apply them, * * * *or a well-settled common law meaning,* notwithstanding an element of degree in the definition as to which estimates might differ, * * * or, as broadly stated by Mr. Chief Justice White in *United States v. Cohen Grocery Co.*, 255 U. S. 81, 92, "that, for reasons found to result either *from the text of the statutes involved or the subject with which they dealt,* a standard of some sort was afforded." ' (Emphasis added.)

This statement was repeated by Mr. Chief Justice Taft in *Cline v. Frink Dairy Co.*, 274 U. S. 445, 459-460. See also *Lanzetta v. New Jersey*, 306 U. S. 451, 453; *Musser v. Utah*, 333 U. S. 95, 97; *Winters v. New York*, 333 U. S. 507, 515. And there are a long line of Maryland cases in accord therewith. Among them, see *State v. Magaha*, 182 Md. 122, 125, 32 A. 2d 477; *Glickfield v. State*, 203 Md. 400, 404, 101 A. 2d 229; *Blake v. State*, 210 Md. 459, 462,

124 A. 2d 273; *Miedzinski v. Landman,* 218 Md. 3, 11, 145 A. 2d 220." *Id.* at 149-50.

Similar observations were made by Mr. Justice Marshall in *Grayned v. City of Rockford,* 408 U. S. 104, 92 S. Ct. 2294, 33 L.Ed.2d 222 (1972):

> "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to ' "steer far wider of the unlawful zone" . . . than if the boundaries of the forbidden areas were clearly marked.' " *Id.* at 108-09. (Footnotes omitted.)

In *Whitehill v. Elkins,* 389 U. S. 54, 88 S. Ct. 184, 19 L.Ed.2d 228 (1967), Whitehill objected to being required, when taking a teaching position at the University of Maryland, to swear that he was "not engaged in one way or another in the attempt to overthrow the Government of the United States, or the State of Maryland, or any political subdivision of either of them, by force or violence." The oath, under the penalties of perjury, was one required pursuant to the authority of Maryland Code (1957) Art. 85A, § 11. The

language used was an adaptation of § 13 into the words of the representation made by the Attorney General of Maryland to the Supreme Court at the time of argument of *Gerende v. Board of Supervisors of Elections of Baltimore City*, 341 U. S. 56, 71 S. Ct. 565, 95 L.Ed. 745 (1951). In the process of reversing a three-judge panel in the United States District Court for the District of Maryland which had dismissed a challenge to that oath, Mr. Justice Douglas said for the Court:

> "The prescribed oath requires, under threat of perjury, a statement that the applicant is not engaged 'in one way or another' in an attempt to overthrow the Government by force or violence. Though we assume *arguendo* that the Attorney General and the Board of Regents were authorized so to construe the Act as to prescribe a narrow oath (1) that excluded 'alteration' of the Government by peaceful 'revolution' and (2) that excluded all specific reference to membership in subversive groups, we still are beset with difficulties. Would a member of a group that was out to overthrow the Government by force or violence be engaged in that attempt 'in one way or another' within the meaning of the oath, even though he was ignorant of the real aims of the group and wholly innocent of any illicit purpose? We do not know; nor could a prospective employee know, save as he risked a prosecution for perjury." *Id.* at 59.

Probably the most recent pronouncement of the Supreme Court in the field of vagueness is found in *Smith v. Goguen*, 415 U. S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). There, Mr. Goguen had been prosecuted because he "wore a small cloth version of the United States flag sewn to the seat of his trousers." He was prosecuted under a Massachusetts statute which then read in relevant part:

> "Whoever publicly mutilates, tramples upon, defaces or treats contemptuously the flag of the United States . . . , whether such flag is public or

private property . . . , shall be punished by a fine of not less than ten nor more than one hundred dollars or by imprisonment for not more than one year, or both. . . ."

Mr. Justice Powell there said for the Court:

"The statutory language under which Goguen was charged, however, fails to draw reasonably clear lines between the kinds of nonceremonial treatment that are criminal and those that are not. Due process requires that all 'be informed as to what the State commands or forbids . . . ,' *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939), and that 'men of common intelligence' not be forced to guess at the meaning of the criminal law. *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1932). Given today's tendencies to treat the flag unceremoniously, those notice standards are not satisfied here.

"We recognize that in a noncommercial context behavior as a general rule is not mapped out in advance on the basis of statutory language. In such cases, perhaps the most meaningful aspect of the vagueness doctrine is not actual notice but the other principal element of the doctrine — the requirement that a legislature establish minimal guidelines to govern law enforcement. It is in this regard that the statutory language under scrutiny has its most notable deficiencies.

"In its terms, the language at issue is sufficiently unbounded to prohibit, as the District Court noted, 'any public deviation from formal flag etiquette. . . .' 343 F. Supp., at 167. Unchanged throughout its 70-year history, the 'treats contemptuously' phrase was also devoid of a narrowing state court interpretation at the relevant time in this case. We are without authority to cure that defect. Statutory language of such a standardless sweep allows policemen, prosecutors,

and juries to pursue their personal predilections. Legislatures may not so abdicate their responsibilities for setting the standards of the criminal law. *E.g., Papachristou v. City of Jacksonville,* 405 U.S. 156, 165-169 (1972). In *Gregory v. City of Chicago,* 394 U.S. 111, 120 (1969), Mr. Justice Black voiced a concern that we share against entrusting lawmaking 'to the moment-to-moment judgment of the policeman on his beat.' The aptness of his admonition is evident from appellant's candid concession during oral argument before the Court of Appeals regarding state enforcement standards for that portion of the statute under which Goguen was convicted:

'. . . [A]s counsel [for appellant] admitted, a war protestor who, while attending a rally at which it begins to rain, evidences his disrespect for the American flag by contemptuously covering himself with it in order to avoid getting wet, would be prosecuted under the Massachusetts statute. Yet a member of the American Legion who, caught in the same rainstorm while returning from an "America — Love It or Leave It" rally, similarly uses the flag, but does so regrettably and without a contemptuous attitude, would *not* be prosecuted.' 471 F.2d, at 102 (emphasis in original).

Where inherently vague statutory language permits such selective law enforcement, there is a denial of due process." *Id.* 94 S. Ct. at 1248. (Footnotes omitted.)

I regard it as of more than passing significance that Professor E. Wayne Thode, reporter for the Committee of the American Bar Association which revised the Code of Judicial Conduct of that association (the "Traynor Committee"), stated:

"When I was considering the substantive issues

presented by Canon 25, and how they should be dealt with in the new *Code*, at no time did I consider recommending to the Traynor Committee that it consider using the standard of 'reasonable suspicion.' In my judgment the phrase was too nebulous and therefore too difficult to apply as a standard. I cannot recall that the phrase was ever discussed at a committee meeting, and I am substantially certain that no member of the committee ever suggested that we continue to use the standard of 'reasonable suspicion.' "

It was under that "reasonable suspicion" interpretation of ABA Canon 25 (Maryland Canon XXIV) that it had been said that a judge should not act as an officer or director of a bank or other private business corporation. The Commission and the majority would have us understand that at the time of our adoption of the canons the interpretations thereof were fully understood by bench and bar, yet Professor Thode, in his Reporter's Notes to Code of Judicial Conduct 81 (1973), is authority for the fact that a poll conducted by the Traynor Committee of appellate and trial judges across the length and breadth of this country showed over 14 percent of the appellate judges and over 13 percent of the trial judges answering the questionnaire to be directors of such corporations.

The fact that the nuances of this rule, with its vagueness, have not been fully comprehended by all is well illustrated by the oral comments of the Honorable S. Ralph Warnken, a retired judge of the Supreme Bench of Baltimore City, at the annual meeting of the Maryland State Bar Association in July, 1965. Judge Warnken was Chairman of the Committee on Judicial Ethics. He reported to the association that an individual who had been appointed to fill a vacancy in one of the circuit courts was a director of a building association at the time of his appointment. The new judge made inquiry of the committee as to "whether he could continue as such in an advisory capacity but still as a director after he qualified." The comments of Judge Warnken are recorded in 70 Transactions of Md. St. B. Ass'n (1965):

"We took the position that there was no substantial difference between a bank and a building association these days because both of them advertise greatly, and they do list of course the persons who are the directors, and therefore our answer to the question was in our opinion it would be improper for a judge to be a director of a building association.

"I might add this. There is one very excellent judge in Maryland who had for many years been a director of a bank. I think he was also an officer, but it is the directorship I am undertaking to put the emphasis on, and this was called to his attention. He said he didn't know it, he wasn't entirely sympathetic with the view, but nevertheless that he was a stickler for exactness, and in view of the fact our Committee had so ruled in effect following the American Bar Association Committee he was resigning the position he had with the bank and which he had had for a long period of time.

"The importance of mentioning this matter at this time is that I understand that perhaps there are other situations like that of the one judge who did decide to resign after he learned what the A.B.A. Committee had decided. Also in case any new judges come along they will then have the benefit of how the Ethics Committee of this Association feels about it, and perhaps they will guide themselves accordingly.

"THE PRESIDENT: Judge Warnken, just an inquiry. I know the case of which you speak and I know it involved a very scrupulously ethical member of the Bench. I am just wondering if it would not be a fair proposition if this ruling in some manner were made known to all of the judiciary in the State. It seems to me that possibly there are members who are not aware of it, and if it is to be applied in one instance it seems to me it should be uniformly applied.

"JUDGE WARNKEN: Certainly I gave some thought to that, and there are two answers, Mr. Chairman. One is that I spoke to Mr. Invernizzi about it and he said in the bulletin of this Association, which I think he has something to do with preparing, which is sent to all the members, he thought it would be advisable to mention that particular phase of it. Then of course when we file our next report at the January meeting I would expect to mention that specifically." *Id.* at 106-07.

I, too, know the very distinguished (now retired) judge to whom Judge Warnken made reference. He is the very soul of integrity. It obviously had not occurred to him prior to consideration of the matter by the committee of which he was a member that he should not serve on the board of a bank, yet we are told that such activity is proscribed by the very canon which we here have under consideration. I regard it as significant that in the adoption of the Canons of Judicial Ethics and the Rules of Judicial Ethics we apparently did not believe that Canon XXIV would sufficiently place judges on notice of the fact that they were forbidden to serve as a director of a bank because we adopted Rule 6 specifically stating that fact.

The argument is made in the majority opinion that the phrase "reasonable suspicion" is not "any more nebulous or less objective than the reasonable and prudent man test which has been a part of our negligence law for centuries." What is overlooked, however, is that the latter test has been refined by judicial opinions during that period. For instance, this Court considered "reasonable care" in *State v. Magaha,* 182 Md. 122, 32 A. 2d 477 (1943). There, after observing that a statute which either commands or forbids the doing of an act in terms so vague that persons of ordinary intelligence must necessarily guess at its meaning and differ as to its application violates the constitutional guarantee of due process of law, Judge Delaplaine said for the Court:

"The prohibited act may be characterized by a general term without definition, if the term has a settled common-law meaning and a commonly

understood meaning which does not leave a person of ordinary intelligence in doubt as to its purport, even though there may be in the definition of the term an element of degree as to which estimates of reasonable men might differ. *State v. Andrews,* 108 Conn. 209, 142 A. 840; *Pacific Coast Dairy v. Police Court,* 214 Cal. 668, 8 P. 2d 140, 80 A.L.R. 1217, 1223. An illustration of this principle is found in the decision that a statute forbidding any person to drive an automobile when intoxicated is not too indefinite to be enforceable merely because the statute fails to set up definite criteria of intoxication, because the condition of intoxication and its common accompaniments are so much a matter of general knowledge that definite and sensible effect may be given to the words of the statute. *Maryland & Pennsylvania R. Co. v. Tucker,* 115 Md. 43, 80 A. 688; *Cumberland & Westernport Transit Co. v. Metz,* 158 Md. 424, 149 A. 4, 565. Similarly the section now before us is as definite in its description as the subject matter will permit. The lack of reasonable care forbidden by the section is of such a nature that it would be impossible to describe the infinite variety of circumstances that may surround such cases. *People v. McMurchy,* 249 Mich. 147, 228 N. W. 723, 728. The term 'reasonable care' is a familiar expression in common speech and in the terminology of the law. Its accepted meaning is that degree of care which a person of ordinary prudence would exercise under similar circumstances. It is recognized, for example, that while an automobile is not such an inherently dangerous machine as to make the rule requiring extraordinary care in the use of dangerous instrumentalities applicable to such a means of conveyance, it may soon become dangerous in the hands of a reckless driver, and it is accordingly an established rule that every automobile driver is required to exercise that degree of care toward other travelers which a person of ordinary

> prudence would exercise under similar circumstances. *Winner v. Linton*, 120 Md. 276, 281, 87 A. 674; *Whitelock v. Dennis*, 139 Md. 557, 561, 116 A. 68; *Spawn v. Goldberg*, 94 N.J.L. 335, 110 A. 656; 36 *Words and Phrases*, Permanent Edition, 265-278." *Id.* at 130-31.

In *Director v. Daniels*, 243 Md. 16, 221 A. 2d 397 (1966), this Court had before it a multi-pronged attack on the validity of Code (1957) Art. 31B, known as the Defective Delinquent Act. This included a determination as to whether the statutory definition of defective delinquent as defined in that article and as applied by the Maryland courts was "sufficiently definitive to permit its practical application within constitutional limitations." In *Sas v. State of Maryland*, 334 F. 2d 506 (4th Cir. 1964), Judge Bell had posed a question as to whether this Court in its reference in *Palmer v. State*, 215 Md. 142, 137 A. 2d 119 (1957), to the term "emotional unbalance" as meaning a "psychopath" or a person with a "psychopathic personality" had rendered the definition so vague and meaningless that it failed to meet the test for definiteness required by the Fourteenth Amendment. This Court adopted the opinion of Chief Judge Digges and Judge Powers in the Circuit Court for Prince George's County. That opinion, which became the opinion of this Court, said in part:

> "We reach the conclusion from the testimony that if, in fact, the Maryland Court of Appeals had placed the word 'psychopath' without further explanation of the use of the term into the statutory definition that it then would be too indefinite to meet the constitutional test. We conclude, however, that careful reading of the *Palmer* case does not dictate this result . . . .

> "It seems clear to us, therefore, that the Court of Appeals was merely saying that the persons described by Guttmacher and Weihofen [, in their book *Psychiatry and the Law*,] as above quoted are 'unbalanced people' as that term is used in the Defective Delinquent Act. The term 'psychopath' as

thus defined does have a definite meaning and describes a medically recognizable group of individuals. We conclude, therefore, that if the legislative enactment as interpreted by the Court of Appeals had defined an emotionally unbalanced person as being a psychopath with no further amplification of the meaning of the word 'psychopath', that its use in that manner would destroy its present acceptability as meeting the requirements of the Fourteenth Amendment. It seems clear to us that a reading of the *Palmer* case, in light of the testimony before us in this case, justifies the conclusion that the Court of Appeals was not in fact importing the term 'psychopath' into the statutory definition but that they were merely incidentally seeking another way of describing some emotionally unbalanced persons." *Id.* at 35-36.

Thus, it will be seen that that which might have been indefinite can be made definite by judicial interpretation and refinement. Unfortunately, however, there have been no interpretations or refinements here, just as the Supreme Court found in *Smith v. Goguen, supra,* that there had been no Massachusetts decisions refining the term which the Supreme Court found unconstitutionally vague in that case.

The judiciary — and the public — are entitled to have a standard to which they may look to determine what is or is not permissible. This canon provides no such standard. It is true, as the majority opinion indicates, that Judge Foster could have applied to the Committee on Judicial Ethics for a determination as to whether his proposed activity was permitted and then he would have been fully protected had he acted upon the basis of that committee's ruling. But is a judge to be condemned because he did not have the foresight to apply for such a ruling? Heretofore, one probably would not have asked the advice of that committee unless a question existed in one's mind relative to contemplated conduct. Attitudes brought out by this case may cause an increase in the work for that committee in the future,

however. Take, for example, the problem posed by Judge Digges at the oral argument in this matter. Professor Laurence M. Katz, a member of the faculty of the University of Maryland School of Law and executive secretary to the Commission, appeared on behalf of the Commission. The record at oral argument at one point is as follows:

"Judge Digges: Well, take a perfectly simple thing. Suppose I want to build a room onto my house. I have to get a permit, so I apply for it. Someone could say, because I got it the next day, that it gave the appearance that they moved it up, quick, because I was a judge. Maybe I just wrote in for it.

"Professor Katz: Well, if indeed, the history was that everyone else who does the same thing that you do, it takes six months and you did it and it takes one week, so quick —

"Judge Digges: What should I do then, send it back and say, 'Don't give it to me yet'?

"Professor Katz: If, indeed, the fact that you as a Judge of the Court of Appeals get such service, and you are fearful that you will get such service and that will put you in a bad light, I think the answer is that you should not permit your name to be used to —

"Judge Smith: Not build the room?

"Professor Katz: *No, I think you should not permit your name to be used in connection with the application.*

"Judge Eldridge: How are you going to do that, use a fictitious name?

"Professor Katz: Judge Foster — Well, I think it has been suggested in some of the articles — not a fictitious name. Now let me, if I may, suggest that Judge Foster —

"Judge Digges: That might be fraud.

"Professor Katz: Judge Foster used Wheeler Holding Company. It would have been perfectly

appropriate — perfectly appropriate for him to act as an anonymous participant in an investment in this particular case. We agree that he, as Judge Foster, using a lawyer would have assisted him not at all. But had Judge Foster used the Wheeler Holding Company as he started out, and a lawyer to represent the Wheeler Holding Company, then Mr. Dell would not have said we were impressed with him because he was Judge Foster." (Emphasis added.)

Here was cited a perfectly innocent proposition, an application for a building permit for an addition to one's home. Yet the executive secretary of the Commission is under the impression that if such a permit were quickly approved and came back by return mail when it normally takes six months to obtain such a permit that a reasonable suspicion would arise that the judge had improperly used the prestige of his office. The building permit ordinances with which I have been familiar have required applications for building permits to be in the name of the record owner of the property. Here the suggestion is made that the judge desiring a building permit "should not permit [his] name to be used in connection with the application."

It seems to me that the definition of reasonable suspicion here is "in the psyche of the beholder," strikingly reminiscent of the criteria advanced by Mr. Justice Stewart in *Jacobellis v. Ohio*, 378 U. S. 184, 197, 84 S. Ct. 1676, 12 L.Ed.2d 793 (1964), for discovering when pornography is "hard core," *i.e.*, that although he could not define it, "I know it when I see it."

Just what conduct on the part of the judiciary is now forbidden by this canon? Are judges forbidden under pain of censure or removal to appear before a committee of the General Assembly in support of legislation which will improve their lot financially or make easier the administration of the courts in which they sit? If so, should we now proceed to censure all of the judges of this State who have engaged in such practice prior to July 1, 1971, as well as since that date?

It may be, as is suggested, that reasonable suspicion is a readily understandable term. Consider, however, the record at the last oral argument when I attempted to obtain a definition of the term from Professor Katz. The record is:

"Judge Smith: Well now, tell me again how you define reasonable suspicion.

"Professor Katz: Reasonable suspicion is to be determined by the facts of the particular case by a fact finder who is to apply the standard of the reasonable man. I think both of our briefs agree to that.

"Judge Smith: Well, in other words, is what you are saying to me that — what you are saying to us — that Judge Foster is susceptible of censure if a reasonable man would have concluded that from that which took place that he had used the prestige of his office to advance his position? Is that what you are saying, sir?

"Professor Katz: Yes, or gave him a reasonable suspicion to.

"Judge Smith: Well, what is a reasonable suspicion? This is what I want to know. This is the problem.

"Professor Katz: Reasonable suspicion is whether the reasonable man would believe that, not that he would necessarily conclude that the impropriety had occurred, but that there was smoke and hence there may very well be fire and when the smoke is caused by the judge's putting himself into that position, the canon prohibits that and admonishes judges not to, I believe, get into a situation where by their activities they create the smoke whether or not there is fire."

I believe that the term "reasonable suspicion" is just as vague as the statement that one is not engaged "in one way or another" in an attempt to overthrow the Government by force or violence and just as vague as the prohibition against

treating the flag of the United States "contemptuously." As previously noted, the Supreme Court of the United States, in *Whitehill v. Elkins, supra,* and *Smith' v. Goguen, supra,* respectively, has determined those two terms to be unconstitutionally vague. Surely, no judge, or any other person, should be placed in jeopardy on the basis of concepts as vague as those demonstrated in the colloquy between Judge Digges and Professor Katz or the smoke and fire definition advanced in the colloquy with me. In the example used by Judge Digges, the judge was absolutely innocent of any intent to use the prestige of his office for the advancement of his own personal ends, yet Professor Katz, as counsel for the Commission, concluded that a reasonable suspicion would exist that he had improperly used the prestige of his office.

As I see it, the test for disciplinary action is as stated in the Constitution and not as stated in the Canons of Judicial Ethics. No canon which fails to meet the standard of the Maryland Constitution, Art. IV, § 4B (b) is acceptable. While this Court clearly has the constitutional authority to promulgate *procedural rules,* it is highly questionable as to whether we can formulate a standard which differs from that in the Constitution. Clearly, we can interpret that provision and we can utilize provisions in the canons as an aid to our interpretation. However, an ad hoc incorporation seems unjustified, especially when the canon with which we are here involved appears not to meet the constitutional standards which speak of *conduct.*

This case is completely unlike *Diener and Broccolino.* There, evidence was presented indicating that pending criminal cases in the nature of charges of violations of the motor vehicle laws were disposed of without trial on a basis favorable to the accused. Such action obviously involved the administration of justice. The facts, if true, clearly amounted to *conduct* prejudicial to the administration of justice. Here, the charges in no way involve the actual administration of the courts. In effect, the allegation is that Judge Foster made a profit. The Commission has found that his acts gave an *appearance* of impropriety, although it has

further found no *actual* improper conduct. I do not think we have yet come to the point in America where it is improper to make an honest dollar. The facts in this case clearly indicate, as pointed out earlier, that Mr. David Jones, a person of no particular prominence in the community, obtained similar zoning for his land before Judge Foster was ever approached relative to purchase of the tract with which he ultimately became involved.

We could afford to pay heed to the statement of the Supreme Court of California in *In re Fahey*, 505 P. 2d 1369 (Cal. 1973). It said in a disciplinary action against a lawyer:

> "Offenses that do not involve moral turpitude or affect professional performance should not be a basis for professional discipline simply because they fall short of the highest standards of professional ethics or may in some way impair the public image of the profession. Otherwise the imposition of discipline may tend to be influenced by the degree to which the offense has become known to the public. (See Weckstein, Maintaining the Integrity and Competence of the Legal Profession, 48 Texas L.Rev. 267, 279). Our standard of moral turpitude depends not on popular impressions but on the violator's own motivation as it relates to his moral fitness to practice law. (Hallinan v. Committee of Bar Examiners, supra, 65 Cal.2d 447, 461-462, 55 Cal. Rptr. 228, 421 P.2d 76; see Yakov v. Board of Medical Examiners, supra, 68 Cal.2d 67, 73-74, 64 Cal. Rptr. 785, 435 P.2d 553.)" *Id.* at 1376. (Footnote omitted.)

In the law review article to which reference was made, D. Weckstein, *Maintaining the Integrity and Competence of the Legal Profession*, 48 Texas L. Rev. 267 (1970), the author states:

> "The reported cases seem to reflect an attitude that attorneys guilty of this conduct [(crimes involving moral turpitude)] will only be disciplined when their misbehavior becomes a matter of public

notoriety. While the respect for lawyers, and consequently the law, would seem to suffer the most harm in those cases, it is questionable whether the offender is deserving of any greater penalty because of such happenstance. Discipline in these cases 'seems more vindictively punitive than it does selectively preventive.'" *Id.* at 279. (Footnotes omitted.)

One may suspect, however well intentioned the original investigation by the media might have been, that without the hue and cry of certain elements of the media against Judge Foster no reasonable suspicion of his misconduct would have been perceived by anyone anywhere. Be that as it may, and regardless of what reasonable suspicion means or whether it is constitutional, everyone admits Judge Foster *did nothing wrong. That was the finding of the Commission.* Conduct which is not wrongful does not become wrongful conduct merely because it creates a suspicion in some others that it might be. Conduct which is *not* prejudicial to the administration of justice does not become conduct which *is* prejudicial because it creates a suspicion in some others that it might be. When there is an affirmative finding of no evil or wrong, there is little that the imagination can conjure up. The Commission argues that acts innocent in and of themselves, when taken together, can create a picture which might lead a reasonable man to suspect foul play. However, this is no standard at all. The number of possible situations in which an individual who does not know all the facts, when confronted with a few select ones, might "reasonably suspect" wrongdoing is limitless.

The majority holds that a judge cannot enter a business venture for the purpose of making money and pursue it with full vigor but within the bounds of propriety if the public might suspect that there was something improper. Not even a judge should be asked to go through life in constant fear that something he does or says, though proper, may be misinterpreted, thereby causing him to be censured or removed.

504

I am of the opinion that the conduct of Judge Foster here was not conduct prejudicial to the proper administration of justice. I am further of the opinion that the standard applied is unconstitutionally vague and is improperly applied to acts occurring prior to July 1, 1971.

I am authorized to state that Judge Digges concurs in this opinion.